The State of Ohio, Appellee, *v.* Johnson, Appellant.

[Cite as *State v. Johnson,* 112 Ohio St.3d 210, 2006-Ohio-6404.]

(No. 2004–1163—Submitted June 20, 2006—Decided December 13, 2006.)

O'Donnell, J.

{¶ 1} Marvin G. Johnson appeals from his convictions entered pursuant to jury verdicts finding him guilty of the aggravated murder of 13–year–old Daniel Bailey and the rape and aggravated robbery of Tina Bailey, Daniel's mother, and from the trial court's imposition of the death penalty.

{¶ 2} Johnson raises 23 propositions of law; however, after review, we find that none are well taken, and pursuant to our independent review of the death sentence in accordance with R.C. 2929.05(A), we affirm these convictions and the sentence imposed.

{¶ 3} The record reveals that Tina Bailey lived on Stewart Avenue in Cambridge, Ohio. Marvin Johnson first met her in 1998 or 1999, and he eventually began living with her on Stewart Avenue. Between 2000 and 2002, an Alabama court incarcerated him for violating parole in connection with a 1988 arson conviction in that state. Upon his release, however, Johnson returned to Ohio and resided with Tina until July 2003.

{¶ 4} During the time Johnson lived with Tina, his use of crack cocaine became problematic. Frequently, Johnson did not come home on payday but would instead disappear for a night or two to spend his paycheck on crack. And due to his drug habit, he only reluctantly contributed money to the household. He also had a strained relationship with Tina's two children, especially Daniel, because he resented Tina's generosity toward them.

{¶ 5} Both Johnson and Tina were friends of Utelius "Eric" Barnes. Johnson occasionally became jealous of Barnes, and he suspected that Tina and Barnes had a relationship.

{¶ 6} On July 3, 2003, after several weeks of tension in her relationship with Johnson, Tina told Johnson to leave. Though she later allowed him back into her house two or three times, she made it clear to him that he did not have permission to enter the house in her absence.

{¶ 7} Nevertheless, twice during the two or three weeks before August 15, 2003, Johnson entered her house while she was at work. On the second occasion,

she returned to find him there, and she ordered him to leave. Johnson refused, and he dared her to call the police. As they argued, according to Tina's trial testimony, Johnson "pulled his arm back," as if to strike her, and he warned that she "shouldn't be surprised if [she] found [her] house in ashes." Eventually, he voluntarily left her home.

{¶ 8} Tina worked as a nurse at the Southeastern Ohio Regional Medical Center, a hospital in Cambridge, Ohio, and during the summer, she often worked the 11:00 p.m. to 7:00 a.m. shift. Her son, Daniel, who would stay at home alone while Tina worked, customarily stayed up until 4:00 or 5:00 a.m. and would phone her at work to say goodnight before he went to bed. On the night of August 14, 2003, Tina worked the late shift while Daniel stayed at home alone, and, in keeping with his habit, he phoned his mother in the early morning hours of August 15 to say goodnight before he went to bed.

{¶ 9} That same evening, Johnson stayed at the home of Lisa Wilson, an acquaintance of his and a drug dealer. David Jones, another Wilson acquaintance, also spent the night at Wilson's home. At midnight, Wilson went on what she described as a "crack run," and she testified that she saw Johnson asleep on her couch when she left. When she returned at 3:00 a.m., she remembered seeing him in the same position, and at 3:30 a.m., when she left a second time, she also noticed him there.

{¶ 10} Around 5:30 a.m., when Wilson returned, she did not see Johnson but learned from David Jones that he had gotten up about 5:00. According to Wilson, Jones also told her that "ten minutes [sic] after [Wilson] had left at 3:30," he heard Johnson "rummaging through a bag in the kitchen" before he left. The bag contained old shoes that Wilson had collected.

{¶ 11} Sometime after Daniel's phone call to his mother, saying goodnight, Johnson beat 13–year–old Daniel Bailey to death. The presence of blood spatters in the living room of the Bailey home established that the beating occurred there.

{¶ 12} According to Dr. Charles Lee, the physician who performed the autopsy, Daniel suffered multiple skull fractures, bruising on his face, and two long lacerations on his head caused by five or six blows from a blunt instrument, possibly a two-by-four. The blows caused Daniel's brain to swell within the skull cavity until his breathing stopped. In such cases, according to Dr. Lee, death "typically takes anywhere from a couple to several minutes."

{¶ 13} After beating Daniel, Johnson gagged and hogtied him with shoelaces he had taken from the bag in Lisa Wilson's home. According to Dr. Lee, Daniel's head injuries occurred before Johnson tied his hands and feet. Dr. Lee also concluded that Daniel was still alive when he was tied up: "Yes, there's no question he was alive. * * * [T]he skin reaction, the red hyperemia next to the

bindings around his wrists shows that * * * the heart was still pumping while these tight bindings were around the wrists."

{¶ 14} After beating Daniel and tying him up, Johnson carried him to the basement of the Bailey home.

{¶ 15} Tina returned from work around 8:00 a.m. and spoke briefly with Utelius Barnes, as he prepared to start his second day of work on the remodeling project at her home. The two went inside and discussed the work for another 20 minutes. Tina then went upstairs.

{¶ 16} When she reached the top of the stairs, she saw Johnson coming out of the bathroom wearing an olive-colored T-shirt and carrying a knife in his hand. As Johnson held the knife up in front of her, Tina asked him to put it down, and said, "[W]here's Daniel, what did you do to Daniel [?]"

{¶ 17} Johnson walked Tina into her bedroom. When Tina began to hyperventilate, Johnson told her to "calm down" and to "keep quiet" because Barnes and another home-remodeler were nearby. According to Tina, Johnson warned that if she did not obey, "he couldn't guarantee that Daniel would be okay." She testified that Johnson told her that Daniel "would be okay," provided that she complied with three demands: first, Johnson wanted to watch Barnes and Tina have sex; second, he wanted to have sex with Tina "one last time" himself; and, third, he wanted $1,000. Tina asked Johnson why he was doing this, and he replied, "[T]his [is] the only way I know how to hurt you."

{¶ 18} She disrobed and performed oral sex on him, and he placed his fingers in her vagina. He continued to hold the knife during these acts. Tina testified that she would not have done this had she not been afraid for Daniel or if Johnson had not held the knife.

{¶ 19} Afterward, according to Tina, Johnson told her to "get up and get dressed, we ha[ve] to go to the bank." She got dressed and walked out of the bedroom ahead of Johnson, who still held the knife. She again asked him to put it down, and he returned to the bedroom and placed the knife under the mattress on the bed. Police later recovered it there with Johnson's thumbprint on it.

{¶ 20} Johnson persuaded Tina to drive him to her bank where, using the drive-through window, she withdrew $1,000 and handed it to him. Bank records and the teller's testimony reveal that this transaction occurred between 8:48 and 8:50 a.m. on August 15. Johnson then had Tina drive him to the parking lot of the local Elks Lodge, and he told her to go home and said he would call to tell her what he had done with Daniel.

{¶ 21} Tina went home and found Daniel in the basement behind her washing machine, gagged, tied and lying face down in a blanket. She tried to remove the

gag and tried to revive him before she ran upstairs and asked one of the home-remodelers to call the police.

{¶ 22} Meanwhile, Johnson went to the home of his friend, Matthew Heskett, where he took off his bloodstained shirt, left it on the floor, and borrowed a clean one from Heskett. He then called a taxi and left for Zanesville.

{¶ 23} While Johnson was en route to Zanesville, the Cambridge police learned of Johnson's departure and radioed the Zanesville police to look for the cab.

{¶ 24} Patrolman Mike Choma of the Zanesville police spotted the cab and saw Johnson walking away from it. Choma and another officer approached Johnson and ordered him to the ground. However, Johnson fled to an abandoned park and hid the money that he had taken from Tina. The police later recovered both the money and the bank envelope.

{¶ 25} The police also recovered Johnson's bloody shirt from the Haskett residence and sent it to the Bureau of Criminal Identification and Investigation ("BCI") for analysis. BCI found the bloodstains on the shirt to be consistent with the DNA profile of Daniel Bailey. According to BCI, the chance of finding the same DNA profile in a random member of the population is one in more than 320 trillion.

{¶ 26} The Guernsey County Grand Jury indicted Johnson on two counts of aggravated murder: Count 1, pursuant to the felony-murder provision in R.C. 2903.01(B), and Count 2, pursuant to the "prior calculation and design" provision in R.C. 2903.01(A). Each aggravated-murder count carried a death-penalty specification charging Johnson as the principal offender in a felony murder, pursuant to R.C. 2929.04(A)(7). The indictment also contained counts for kidnapping, rape, and aggravated robbery. The jury convicted him of all counts and all specifications, and, following the jury's recommendation, the trial judge sentenced him to death.

{¶ 27} On appeal, Johnson presents 23 propositions of law, which we shall consider by topic.

### Erroneous–Specification Issues

{¶ 28} In his 17th proposition of law, Johnson argues that his death sentence should be overturned because of an error in the verdict forms and an alleged error in the jury instructions, as well as alleged misstatements by the trial judge during voir dire.

{¶ 29} We begin by noting that no dispute exists with regard to Johnson's indictment. Count 2 charged him with violating R.C. 2903.01(A), aggravated murder by "prior calculation and design," with a death-penalty specification, pursuant to R.C. 2929.04(A)(7), which contained the aggravating circumstance of felony murder with Johnson alleged to be the principal offender.

{¶ 30} Johnson catalogs three alleged postindictment errors regarding the jury's consideration of the specifications attached to Counts 1 and 2. First, he complains that in the guilt phase of the trial, the jury received a verdict form for the specification under Count 2 that mistakenly omitted the "principal offender" language. Instead of this language, the specification for Count 2 charged that Johnson "committed the aggravated murder with prior calculation and design." Johnson contends that the erroneous substitution of "prior calculation and design" for "principal offender" in the verdict form invalidates his death sentence because the jury returned a verdict finding him guilty of a specification not contained in the indictment presented against him.

{¶ 31} Had Johnson objected to the erroneous verdict form at trial, the court could have corrected it. Because he failed to object, however, he has waived all but plain error. Plain error is "obvious," *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and "but for the error, the outcome of the trial clearly would have been otherwise." See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 32} The error in this case did not determine the outcome of the trial, as *State v. Bonnell* (1991), 61 Ohio St.3d 179, 573 N.E.2d 1082, illustrates. In *Bonnell,* as in this case, the judge failed to instruct the jury on the principal-offender element of the felony-murder specification and failed to include it in the verdict form. In our opinion, we stated, "The evidence in this case does not reasonably suggest that [the] murder was committed by more than one offender. Thus, appellant was either the principal offender, or he committed no offense at all." Id. at 184, 573 N.E.2d 1082.

{¶ 33} Using similar analysis, the United States Supreme Court, in *Mitchell v. Esparza* (2003), 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263, held that omitting the principal-offender allegation from a felony-murder specification constituted harmless error in the context of a habeas corpus action, because the omission could not be considered outcome-determinative. "[T]he jury verdict would surely have been the same had it been instructed to find as well that the respondent was a 'principal' in the offense. After all, he was the only defendant charged in the indictment. There was no evidence presented that anyone other than respondent was involved in the crime or present at the store." Id. at 18, 124 S.Ct. 7, 157 L.Ed.2d 263.

{¶ 34} As in *Bonnell* and *Esparza,* the indictment here named only Johnson as an offender, and no evidence presented at trial suggested involvement by anyone other than Johnson in the murder. Thus, in this case, as in *Esparza,* "the jury verdict would surely have been the same" had the verdict form asked the jury to determine whether Johnson was the principal offender. The verdict form's

substitution of the prior-calculation-and-design element for the principal-offender element of the specification does not alter this analysis.

{¶ 35} Second, Johnson complains that the trial court referred repeatedly during voir dire to "two specifications" when—he claims—only one existed. However, during the voir dire examination, two specifications did exist, one on each of the separate counts of aggravated murder. Johnson did not object to the judge's statements, and we conclude that no error exists in them, let alone plain error. See *State v. Jones* (2001), 91 Ohio St.3d 335, 353, 744 N.E.2d 1163 ("Statements made during voir dire cannot reasonably be thought to affect sentencing verdicts").

{¶ 36} Similarly, Johnson contends that the trial court erroneously referred to "aggravating circumstances," in the plural, while instructing the jury during the penalty phase. However, Johnson again waived the issue because he failed to raise a timely objection, and likewise, this does not constitute plain error. *State v. Smith* (2000), 89 Ohio St.3d 323, 332, 731 N.E.2d 645; *State v. Keenan* (1998), 81 Ohio St.3d 133, 153, 689 N.E.2d 929. There were in fact two aggravating circumstances available for the jury to consider during the penalty phase. Only after the jury returned its penalty-phase verdicts recommending a death sentence for both Counts 1 and 2 did the prosecution ask the trial court to sentence Johnson for Count 2 only.

{¶ 37} Even if the jury improperly considered both aggravating circumstances when it recommended a death sentence on Count 2, our independent review, set forth below, cures the alleged error. See, generally, *Clemons v. Mississippi* (1990), 494 U.S. 738, 745–746, 110 S.Ct. 1441, 108 L.Ed.2d 725; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293; *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70.

{¶ 38} Johnson's 17th proposition of law is therefore overruled.

## Sufficiency of Evidence

{¶ 39} In propositions of law 13 through 15, Johnson challenges the sufficiency of the evidence to support his convictions of kidnapping, rape, aggravated robbery, aggravated murder, and the specification for Count 2.

### A. Kidnapping

{¶ 40} Johnson raises two issues in connection with his conviction for kidnapping Daniel. First, he argues that he could not have kidnapped Daniel, because Daniel died before Johnson hogtied him. Second, he argues that the kidnapping merged with the aggravated murder, and he cannot be convicted of both offenses. We reject these contentions for the following reasons.

{¶ 41} Regarding the first issue, the evidence does not support Johnson's contention that Daniel had died before being restrained. Dr. Lee testified that Daniel was still alive when Johnson tied his hands and feet, and this testimony supports the jury's finding that Johnson restrained Daniel of his liberty.

{¶ 42} Johnson also contends that during voir dire, the state conceded that Daniel had died before Johnson hogtied him. A review of the transcript reveals that the prosecutor stated, "The charges accuse Mr. Johnson of going into the home of Constantina Bailey when Daniel was there alone, beating him to death, tying him up and dragging him into the basement * * *." This statement is not a concession that Johnson killed Daniel before restraining and taking him to the basement.

{¶ 43} Accordingly, we reject Johnson's assertions that Daniel died before Johnson hogtied and carried him to the basement.

{¶ 44} Regarding the second kidnapping issue, Johnson argues that the kidnapping and murder are allied offenses of similar import and must be merged pursuant to R.C. 2941.25 and our decision in *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345.

{¶ 45} R.C. 2941.25(B) provides that two similar offenses that are "committed separately or with a separate animus as to each" may be charged in the indictment and serve as the basis for two separate convictions.

{¶ 46} In *Logan*, we "recognized that where the asportation or restraint 'subjects the victim to a substantial increase in risk of harm separate and apart from * * * the underlying crime, there exists a separate animus.'" *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 90, quoting *Logan*, 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, at paragraph (b) of the syllabus. And "where the restraint is prolonged, *the confinement is secretive,* or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions." (Emphasis added.) *Logan*, 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, paragraph (a) of the syllabus.

{¶ 47} Here, the record supports the conclusion that Johnson's kidnapping of Daniel had a significance and an animus independent of Daniel's murder. Tina testified that she found Daniel hogtied and lying in a blanket behind her washing machine in the basement of her home. Dr. Lee testified that Daniel lived for a time sufficient for his skin to react to the shoelaces. Even if Daniel had lived for only a few minutes after Johnson hogtied him, sufficient evidence existed for the jury to find that Johnson had intended to prevent Daniel from getting assistance for his injuries, had he regained consciousness. Moreover, sufficient evidence existed for the jury to infer that Johnson carried Daniel, while Daniel still lived,

to the basement in order to confine him in secret and to prevent anyone from finding him and rendering aid.

{¶ 48} Hence, the jury could reasonably conclude that when Johnson restrained Daniel and hid him in the basement, he committed an act that had significance independent of, and an animus separate from, murder.

{¶ 49} We overrule Johnson's 13th proposition of law.

## B. Aggravated Robbery

{¶ 50} In his 14th proposition of law, Johnson contends that the state presented insufficient evidence on which to convict him of aggravated robbery in violation of R.C. 2911.01(A)(1), because he left the knife at the Bailey home when he and Tina drove to the bank and because he did not have the knife when Tina gave him the $1,000. The state counters that Johnson committed the offense when, while holding the knife, he demanded $1,000 from Tina and ordered her to take him to the bank.

{¶ 51} Having considered the parties' positions, we agree with the state. R.C. 2911.01(A)(1) provides, "No person, in attempting or committing a theft offense * * * shall do any of the following: * * * Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

{¶ 52} The uncontroverted evidence in the record shows that Johnson held the knife to Tina when he demanded that she give him $1,000 and that she drive him to the bank. Thus, sufficient evidence exists to support the jury's finding that Johnson violated R.C. 2911.01(A)(1) by having "a deadly weapon on or about [his] person" while "attempting or committing a theft offense."

## C. Rape

{¶ 53} Also, in his 14th proposition, Johnson contends that insufficient evidence exists to prove his rape conviction beyond a reasonable doubt because the state adduced no physical evidence, such as rape-kit evidence, to corroborate Tina's testimony. However, Tina's testimony satisfies the test established in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Corroboration of victim testimony in rape cases is not required. See *State v. Sklenar* (1991), 71 Ohio App.3d 444, 447, 594 N.E.2d 88; *State v. Banks* (1991), 71 Ohio App.3d 214, 220, 593 N.E.2d 346; *State v. Lewis* (1990), 70 Ohio App.3d 624, 638, 591 N.E.2d 854; *State v. Gingell* (1982), 7 Ohio App.3d 364, 365, 7 OBR 464, 455 N.E.2d 1066. Johnson's 14th proposition is not well taken.

### D. Felony Murder

{¶ 54} In his 15th proposition of law, Johnson contends that the rape and aggravated robbery of Tina Bailey cannot be used to support the aggravated-murder charge based on felony murder or the felony-murder death specification, because Johnson did not commit the rape and aggravated robbery *"while committing"* the aggravated murder of Daniel Bailey.  R.C. 2903.01(B).

{¶ 55} However, "the term 'while' does not indicate * * * that the killing must occur at the same instant as the [predicate felony], or that the killing must have been caused by the [felony]." *State v. Cooper* (1977), 52 Ohio St.2d 163, 179–180, 6 O.O.3d 377, 370 N.E.2d 725.  Nor does it mean that the felony must have been the motive for the killing.  *State v. Williams* (1996), 74 Ohio St.3d 569, 577, 660 N.E.2d 724; *State v. McNeill* (1998), 83 Ohio St.3d 438, 441, 700 N.E.2d 596.

{¶ 56} Rather, "while" means that "the killing must be directly associated with the [felony] as part of one continuous occurrence * * *." *Cooper,* 52 Ohio St.2d at 179–180, 6 O.O.3d 377, 370 N.E.2d 725.  See, also, *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895.  "[T]he term 'while' means that the death must occur as part of acts leading up to, or occurring during, or immediately subsequent to the [relevant felony]." *Williams,* 74 Ohio St.3d at 577, 660 N.E.2d 724.  "The sequence of events" may be "examined in light of time, place, and causal connection" to determine whether it "amounts to 'one continuous occurrence.'" *McNeill,* 83 Ohio St.3d at 441, 700 N.E.2d 596, quoting *Cooey,* 46 Ohio St.3d at 23, 544 N.E.2d 895.

{¶ 57} The evidence presented in this case supports a finding that Daniel's murder occurred sometime between 5:00 and 6:00 a.m., on August 15, 2003.  Dr. Janet Brockwell, the Guernsey County Coroner, observed the autopsy performed by Dr. Lee and estimated Daniel's time of death at between 4:00 and 6:00 a.m. Johnson had been sleeping on Lisa Wilson's couch at 3:30 a.m., but had left by 5:30 a.m. Wilson testified that David Jones told her that "he had gotten up about 5:00, ten minutes [sic] after [Wilson] had left at 3:30."  According to Wilson, Jones "said he heard him rummaging through a bag in the kitchen and then he left."  Based on this information, the jury could have found that Johnson left Wilson's house shortly before the time of Daniel's murder.

{¶ 58} The rape occurred sometime after 8:20 a.m. The aggravated robbery began at about the same time, when Johnson demanded $1,000 from Tina while threatening her with the knife.  Thus, two to three hours elapsed between Daniel's kidnapping and death, and the rape and aggravated robbery of his mother, Tina.

{¶ 59} However, the relationship between the victims and the situs of the crimes connect these offenses.  The aggravated murder, the kidnapping, the rape, and the beginning of the aggravated robbery all occurred at Tina's home,

where Johnson knew that Daniel would be alone and knew he could overpower and kill him. He did so and then waited for Tina to arrive home from work. He used Daniel's disappearance, in addition to the knife, as a means to commit the rape and the robbery.

{¶ 60} Thus, when viewed "in light of time, place, and causal connection," *McNeill,* 83 Ohio St.3d at 441, 700 N.E.2d 596, the jury could have found that the aggravated murder "occur[red] as part of acts leading up to" the rape and aggravated robbery. *Williams,* 74 Ohio St.3d at 577, 660 N.E.2d 724. Based on this analysis, we conclude that the kidnapping, the aggravated murder, the rape, and the aggravated robbery constitute one continuous occurrence.

{¶ 61} In proposition 15, Johnson also challenges the jury instructions for the felony-murder charge in Count 1 and the specification appended to Count 2. Both the charge and specification alleged that Johnson committed the murder "while" committing or "while" fleeing after committing other felonies. The trial court instructed the jury in this regard that the term "while" means that "the death must occur as part of acts leading up to or occurring during or immediately after the commission of kidnapping, rape, aggravated robbery and the death was directly associated with the commission of the kidnapping, rape *or* aggravated robbery or flight immediately after the commission of those crimes." (Emphasis added.)

{¶ 62} Because the court instructed the jury in the disjunctive, Johnson argues that it cannot be determined whether the jury found Daniel's murder to be directly associated not only with Daniel's kidnapping but also with the rape and robbery of Tina. For this reason, he urges the court to vacate his conviction of the felony-murder offense and specification.

{¶ 63} Our examination of the record, however, reveals that Johnson did not object to the instructions, and we therefore review his claim under the plain-error standard. We conclude that no plain error exists with regard to the instructions given to the jury on this issue.

{¶ 64} We rejected a similar argument in *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 51–53, in which the trial court had instructed the jury on the five purposes listed in the kidnapping statute, R.C. 2905.01(A), but did not instruct the jury to reach a unanimous verdict as to which of those purposes was the basis for each of three kidnapping charges. Upon review, we determined that when the jury unanimously reaches a verdict, the individual jurors need not agree on which of the alternative bases support their individual findings. Id. at ¶ 55, following *Schad v. Arizona* (1991), 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555.

{¶ 65} Similarly, in this case, we know that the jurors unanimously convicted Johnson of kidnapping, rape, and aggravated robbery, any one of which satisfies the necessary element for both felony murder and the specification. We also

know—by virtue of the jury's guilty verdicts on Count 1 and on the Count 2 specification—that the jury concluded that Johnson committed the murder while committing or while fleeing after committing at least one of those felony offenses. It was not necessary for the jurors to agree unanimously that the murder occurred while *all three* of those offenses were being committed or while Johnson was fleeing afterwards. We therefore conclude that no plain error occurred in the use of the word "or" in the instructions for the felony-murder count and the second specification.

{¶ 66} Accordingly, we overrule this proposition of law.

### Right–to–Counsel Issues

### A. Defendant's Request for New Counsel

{¶ 67} At a pretrial hearing on March 10, 2004, Johnson asked the trial court to replace his appointed counsel. In his first proposition of law, Johnson contends that the trial court denied him the right to effective assistance of counsel by failing to inquire sufficiently into the basis for his request.

{¶ 68} In *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, we held that a court has a duty to inquire into such a request: "Where, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel * * *, it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record." Id., syllabus. However, as one Ohio appellate court has rightly explained, the "limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further." *State v. Carter* (1998), 128 Ohio App.3d 419, 423, 715 N.E.2d 223, citing *Deal,* 17 Ohio St.2d at 19, 46 O.O.2d 154, 244 N.E.2d 742.

{¶ 69} The record before us reveals the following in regard to Johnson's request for new counsel:

{¶ 70} On February 11, 2004, Johnson's trial counsel referred during a pretrial hearing to an article in the Sunday, February 8, 2004, issue of the *Daily Jeffersonian,* which purported that Johnson, from jail, had asked Daniel's grandmother whether she would "like to know what the little boy's last words were." Based on this report, and other related articles appearing in both the *Jeffersonian* and the *Zanesville Times Recorder,* defense counsel moved for a change of venue, which the court denied. The court did delay the starting date of the trial for several weeks, however, and also imposed a limited gag order on the news media.

{¶ 71} At a pretrial hearing on March 10, 2004, Johnson asked that his attorneys be removed from the case. He elaborated: "I feel as though I'm not being represented properly to the best of my [sic] ability. I can represent myself

better than I'm being represented. I have questions to address to the Court but I'm not allowed to from my attorneys." The judge asked Johnson's counsel to respond. Johnson's lead counsel, Jack Blakeslee, stated that in his opinion, Johnson wanted new counsel because "basically he doesn't like to hear what we tell him."

{¶ 72} The judge asked Johnson to speak, and Johnson responded, "I have questions I would like to address [to] the Court but I'm told I am—[.]" The trial judge interrupted Johnson to caution that anything he said could be used against him at trial, then allowed him to resume. Johnson said: "What I would like to say * * * is okay hopefully the newspaper is here today so they can actually print something I actually said in court—[.]" Blakeslee interrupted: "I'm going to object to this. I'm telling the defendant to keep your mouth shut."

{¶ 73} The trial judge cautioned Johnson to "proceed with care" and stated: "If you wish to address the Court you may * * * write a letter to the Judge." Johnson said he had been "told not to do that," and the judge said, "Well, then you should follow the advice of your counsel."

{¶ 74} Johnson said, "I still would like to address the Court pertaining to questions—[.]" The judge replied, "Your attorney has objected to that and I'm going to honor that objection at this time * * *." Johnson continued to insist on asking his questions. Blakeslee said, "I'm objecting to it's being [sic] going in the newspaper. * * * It's going to be out there." The defendant said, "Exactly. * * * The newspaper printed something I didn't say." The judge noted that he had taken care to guard against "an atmosphere of what was perceived to be prejudicial pretrial publicity to [Johnson]."

{¶ 75} Johnson said, "[Y]eah, but what I would like to know is how can the newspaper just print something I didn't say." The judge declined to answer that question, but said, "If you want to address these matters you may bring them to my attention in proper form."

{¶ 76} At his next court appearance, on March 30, 2004, Johnson did not renew his request for new counsel. Instead, defense attorney Andrew Warhola stated: "Mr. Johnson has advised me that he will not be speaking during any of these proceedings, that he wants me to speak on his behalf."

{¶ 77} The record does not support Johnson's claim that the court failed to inquire into his complaints. The court gave him an opportunity to present any complaints against counsel in open court, on the record, or in the form of a letter to the judge. The limited inquiry by the court afforded Johnson an opportunity to address his concern to the court regarding potential prejudice from pretrial publicity. When given the opportunity to speak, however, Johnson asked only, "[H]ow can the newspaper just print something I didn't say[?]"

{¶ 78} This complaint did not entitle Johnson to a change of counsel or to broader inquiry by the court. Accordingly, we overrule this proposition.

## B. Waiver of Counsel

{¶ 79} During a brief portion of the guilt phase of the trial, Johnson waived counsel and represented himself. In his 18th proposition of law, Johnson contends that because the trial court failed to advise him sufficiently of the dangers and disadvantages of self-representation, his waiver should be declared invalid as not having been knowingly, intelligently, and voluntarily made.

{¶ 80} Two attorneys represented Johnson throughout the state's case-in-chief. When the state rested, Johnson's counsel also rested. At that point, however, contrary to counsel's advice, Johnson expressed a desire to testify on his own behalf, which caused defense counsel to ask the court to inquire into Johnson's competence to stand trial or make a statement. The court engaged in a colloquy with Johnson during which Johnson correctly recited the charges against him and affirmed his understanding that a death sentence could be imposed. Johnson then renewed his earlier request that his counsel be relieved.

{¶ 81} Upon reflection, Johnson decided not to testify, but announced his intent to call Tina Bailey as a defense witness during the guilt phase of the trial. One of Johnson's lawyers told the court that Johnson was calling Tina to testify against the lawyers' advice. The following colloquy then occurred:

{¶ 82} "Q. [trial judge] Mr. Johnson, will you be proceeding as your own—

{¶ 83} "A. Yes, sir.

{¶ 84} "Q. You're proceeding pro se then?

{¶ 85} "A. Yes, sir.

{¶ 86} "Q. And you understand you will be subject to the same rules of procedure and evidence that would apply to any other person?

{¶ 87} "A. Yes, sir."

{¶ 88} At that point in the proceedings, Johnson represented himself, but the trial judge, over Johnson's protests, designated his trial counsel as standby counsel. Johnson called Tina as a defense witness, questioned her, and then made a brief closing argument to the jury. However, defense counsel also continued to assist Johnson: they made motions for a mistrial and for a competency evaluation and discussed jury instructions with the trial judge and the prosecutor. The trial court also let defense counsel argue to the jury at the close of the guilt phase after Johnson did. Johnson's attorneys then resumed their full representation of him during the penalty phase of the trial.

{¶ 89} A criminal defendant has the constitutional right to represent himself at trial. *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562.

However, "the Constitution * * * require[s] that any waiver of the right to counsel be knowing, voluntary, and intelligent * * *." *Iowa v. Tovar* (2004), 541 U.S. 77, 87–88, 124 S.Ct. 1379, 158 L.Ed.2d 209. "In order to establish an effective waiver of [the] right to counsel, the trial court must make sufficient inquiry to determine whether defendant fully understands and intelligently relinquishes that right." *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph two of the syllabus. And Crim.R. 44(A) provides that a defendant is entitled to counsel "unless the defendant, after being fully advised of his right to assigned counsel, knowingly, intelligently, and voluntarily waives his right to counsel."

{¶ 90} Johnson contends on appeal that the warnings the trial court gave him failed to comply with Crim.R. 44(A), as construed in *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227. There we held: "In the case of a 'serious offense' * * * when a criminal defendant elects to proceed pro se, the trial court must demonstrate substantial compliance with Crim.R. 44(A) by making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel." Id., paragraph two of the syllabus.

{¶ 91} We said further in that case that the trial court "did not adequately explain the nature of the charges, the statutory offenses included within them, the range of allowable punishments, possible defenses, mitigation, or other facts essential to a broad understanding of the whole matter." Id. at ¶ 43, citing *Von Moltke v. Gillies* (1948), 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (plurality opinion). Johnson contends, likewise, that the trial court in this case failed to explain "the nature of the charges, the statutory offenses included within them, the range of allowable punishments, possible defenses, mitigation, or other facts essential to a broad understanding of the whole matter."

{¶ 92} In considering Johnson's contentions, we note that this case is factually distinguishable from *Martin*. First, the defendant in *Martin* conducted his entire defense by himself. Id. at ¶ 19. Johnson, in contrast, had representation throughout his trial until he waived his right to counsel at the close of the state's case. Hence, "it may be proper to presume that the defense counsel who represented [defendant] * * * had discussed all relevant aspects of the case with him." *Maynard v. Meachum* (C.A.1, 1976), 545 F.2d 273, 279.

{¶ 93} *United States ex rel. Konigsberg v. Vincent* (C.A.2, 1975), 526 F.2d 131, illustrates the importance of this distinction. After 12 days of trial, the defendant, "no stranger to the federal courts," 526 F.2d at 132, fired his lawyer, waived counsel, and represented himself. The trial court directed that counsel sit at counsel table and assist, id. at 133, and the defendant "confer[red] repeatedly with his lawyers throughout the trial." Id. at 134.

{¶ 94} Konigsberg argued that this constituted an invalid waiver of counsel "because the [trial] judge failed to explore the consequences with him on the record." Id. However, the Second Circuit held "that the specific 'factual background' may in some instances excuse the judge's failure to give 'explicit warning and advice' regarding the waiver of counsel." Id., quoting *United States v. Rosenthal* (C.A.2, 1972), 470 F.2d 837, 845. The court noted, "Konigsberg had been continuously represented prior to and during trial. He made his decision to represent himself with full knowledge of his right to counsel and of the importance of having counsel. Whatever might be the need in other situations, Konigsberg's involvement with the courts was such that there was no need for [the judge] to explain all this to him." Id.

{¶ 95} Here, as in *Konigsberg*, Johnson "had been continuously represented prior to and during trial," and he had experience in the courts due to his prior criminal history.

{¶ 96} We also distinguish *Martin* because, in that case, we deemed the trial court's warnings inadequate due to Martin's confusion regarding self-representation and the trial court's failure to explain it to him. Martin *disclaimed* any desire to "act as [his] own lawyer"; rather, he wanted to be co-counsel. *Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 9. Under those circumstances, we held, the trial court should have advised him "that he had no right to be 'co-counsel' and that his only choices were to proceed pro se or with counsel." Id. at ¶ 44. We held that absent such a warning, Martin did not knowingly, intelligently, and voluntarily waive counsel.

{¶ 97} In contrast, Johnson displayed no confusion about what he wanted or what self-representation meant. Moreover, the record establishes that he knew the nature of the charges against him and that he was facing a potential death sentence.

{¶ 98} Based on the foregoing, the trial court made a sufficient inquiry to determine that Johnson knowingly, intelligently, and voluntarily waived his right to counsel, and, thereby, it substantially complied with Crim.R. 44.

{¶ 99} We agree with Johnson that the court erred when it did not obtain a written waiver of counsel from him, as directed by Crim.R. 44(C). However, because the trial court substantially complied with Crim.R. 44, "the failure to file a written waiver is harmless error." *Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 39.

{¶ 100} Johnson also contends that the trial court insufficiently warned him of the dangers of self-representation, and we acknowledge that *Faretta* holds that a defendant electing to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing.'" 422 U.S. at 835, 95 S.Ct. 2525, 45 L.Ed.2d 562,

quoting *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268.

{¶ 101} However, the United States Supreme Court "ha[s] not * * * prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel. The information a defendant must possess in order to make an intelligent election * * * will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Tovar*, 541 U.S. at 88, 124 S.Ct. 1379, 158 L.Ed.2d 209.

{¶ 102} The Sixth Amendment does not require extensive warnings in every case. In *Faretta*, for instance, the trial judge gave this warning: "You are going to follow the procedure. You are going to have to ask the questions right. If there is an objection to the form of the question and it is properly taken, it is going to be sustained. We are going to treat you like a gentleman. We are going to respect you. We are going to give you every chance, but you are going to play with the same ground rules that anybody plays. And you don't know those ground rules. You wouldn't know those ground rules any more than any other lawyer will know those ground rules until he gets out and tries a lot of cases. And you haven't done it." *Faretta*, 422 U.S. at 808, 95 S.Ct. 2525, 45 L.Ed.2d 562, fn. 2.

{¶ 103} In *Faretta*, the Supreme Court held the foregoing warning sufficient and the defendant's waiver of counsel valid: "Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the 'ground rules' of trial procedure." Id. at 835–836, 95 S.Ct. 2525, 45 L.Ed.2d 562.

{¶ 104} Similarly, in this case, the trial court warned Johnson that he would be "subject to the same rules of procedure and evidence that would apply to any other person." Johnson acknowledged that he understood that. Further, because Johnson had witnessed various pretrial hearings, the voir dire process, and four days of trial testimony before attempting to waive counsel, the court knew that Johnson understood "that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story." *Maynard*, 545 F.2d at 279.

{¶ 105} Under these circumstances, the trial court reasonably determined that Johnson had sufficient understanding of the case and the consequences of self-

representation to make a voluntary, knowing, and intelligent choice to waive his right to counsel and represent himself.

{¶ 106} We therefore overrule Johnson's 18th proposition of law.

### C. Ineffective Assistance

{¶ 107} In his fifth and 19th propositions of law, Johnson raises several issues regarding ineffective assistance of trial counsel.

{¶ 108} In his fifth proposition of law, Johnson contends that his trial counsel rendered ineffective assistance by failing to challenge two veniremen, for cause, in response to their answers to defense counsel's questions regarding their ability to consider a life sentence as the penalty for the murder of a child.

{¶ 109} In questioning Barbara Grant, the following colloquy occurred between defense counsel and the prospective juror:

{¶ 110} "Q. [defense counsel] Would you have difficulty voting for a life sentence if you convicted a person of an intentional and deliberate murder of a child?

{¶ 111} "A. Deliberate? *No.*

{¶ 112} "Q. So you could vote for a life sentence?

{¶ 113} "A. Not if he deliberately killed a child, no.

{¶ 114} "Q. That's what I asked. Let me rephrase the question. * * * I've been doing this for 30 years and it's hard for me to get these questions out. So *would you have difficulty voting for a life sentence* if you convicted a person of an intentional and deliberate murder of a child?

{¶ 115} "A. *No.*

{¶ 116} "Q. So you *could* vote for a life sentence?

{¶ 117} "A. *Yes, I could. Yes.*" (Emphasis added.)

{¶ 118} Grant also said that she could consider mitigating factors, such as mental disease, drug use, child abuse, and parental abandonment.

{¶ 119} In order to establish that trial counsel's failure to challenge Grant constitutes ineffective assistance, Johnson must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.

{¶ 120} Grant's responses during voir dire do not suggest or create an inference of bias such that Johnson may claim that trial counsel's failure to challenge Grant constitutes deficient performance. See *State v. Davis* (1991), 62

Ohio St.3d 326, 350, 581 N.E.2d 1362. Thus, counsel's failure to challenge Grant does not constitute ineffective assistance of counsel.

{¶ 121} The other venireman challenged here by Johnson, Sara Danadik, stated that the death penalty would be appropriate for the intentional, premeditated murder of a child. However, the record does not show that she said she would automatically vote for such a penalty. In fact, she said she could consider a life sentence in such a case "[i]f the evidence and the circumstances warrant it." As with Grant, Danadik's voir dire responses do not support an inference of bias, and failure to challenge for cause does not amount to ineffective assistance of counsel.

{¶ 122} Accordingly, we overrule this proposition of law.

{¶ 123} In his 19th proposition of law, Johnson contends that his trial counsel rendered ineffective assistance before trial, during voir dire, at the guilt phase of the trial, during the competency hearing, and during the penalty phase of the trial.

## A. Pretrial

{¶ 124} Prior to trial, defense counsel requested a competency evaluation of Johnson. The court granted the request, but counsel withdrew it before the evaluation took place. Counsel explained that they requested an evaluation because Johnson refused to cooperate in his defense. But because Johnson changed his mind and decided to cooperate, counsel no longer questioned his competence to stand trial.

{¶ 125} Johnson alleges that counsel rendered ineffective assistance by withdrawing the request, but he fails to explain why this constitutes deficient performance or how it became prejudicial. Thus, he fails to demonstrate ineffective assistance.

## B. Voir Dire

{¶ 126} Johnson contends that counsel committed four errors during voir dire:

{¶ 127} First, Johnson alleges that counsel failed to object when the trial judge referred to the jury's death-penalty recommendation as a "recommendation." However, as these references were accurate, they are not objectionable. See, e.g., *State v. Mitts* (1998), 81 Ohio St.3d 223, 232–233, 690 N.E.2d 522.

{¶ 128} Second, Johnson characterizes counsel's voir dire examination regarding mitigation as "superficial," but he does not explain his reasoning. A reviewing court generally will not second-guess counsel's judgments about what questions to ask on voir dire. See *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042; *State v. Coleman* (1999), 85 Ohio St.3d 129, 135, 707 N.E.2d 476. Johnson's allegation provides no basis for us to find ineffective assistance of counsel in this regard.

{¶ 129} Third, Johnson contends that his counsel failed to object to repeated comments that the jury needed to convict Johnson of the death specification in order to reach the mitigation phase, but he does not explain why these comments were objectionable or prejudicial. They are neither.

{¶ 130} Fourth, Johnson claims that his counsel failed to object when the court read a list of all seven statutory mitigating factors to the prospective jurors during voir dire. Cf. *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542. However, even assuming that *DePew* applies to voir dire, Johnson fails to explain how the alleged error prejudiced him, particularly at such an early stage in the proceedings and when no such error occurred later in his trial or sentencing.

### C. Guilt Phase

{¶ 131} Johnson alleges ineffective assistance, during the guilt phase, in seven instances:

{¶ 132} First, Johnson contends that his counsel rendered ineffective assistance by conceding in opening statement that Johnson killed Daniel Bailey. Counsel stated the following to the jury:

{¶ 133} "There is an aggravated murder here. There was purposely, prior calculation and design. Marvin Johnson did kill Daniel Bailey. The issue is whether or not this was during the commission of a kidnapping or was there a kidnapping committed in this case. * * * There is an aggravated murder in this case but we contend there were no death penalty specifications that were involved here. Indeed, we contend there was not a rape. We contend there was not an aggravated robbery. But if you find that there was a rape, that there was an aggravated robbery we contend that that still does not make this a death penalty eligible case."

{¶ 134} Conceding guilt in a capital case does not necessarily constitute deficient performance. *Florida v. Nixon* (2004), 543 U.S. 175, 190–191, 125 S.Ct. 551, 160 L.Ed.2d 565; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 338, 703 N.E.2d 1251. "Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. * * * In such cases, 'avoiding execution [may be] the best and only realistic result possible.'" *Florida v. Nixon*, 543 U.S. at 191, 125 S.Ct. 551, 160 L.Ed.2d 565, quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Section 10.9.1, Commentary (Rev.Ed. 2003), reprinted in 31 Hofstra L.Rev. (2003) 913, 1040.

{¶ 135} In this case, the record contains overwhelming evidence of Johnson's culpability for Daniel's murder, and Johnson at no point claimed innocence. We decline to second-guess trial counsel's decision to concede guilt on the murder

charge but to dispute each of the other felonies that formed the basis for the death-penalty specifications. Moreover, in light of the evidence against him, Johnson cannot demonstrate how the concession caused him prejudice or might have altered the trial's outcome. See *Goodwin*, 84 Ohio St.3d at 338, 703 N.E.2d 1251. Therefore, counsel's concession in opening does not constitute ineffective assistance of counsel in this case.

{¶ 136} Second, Johnson contends that his counsel rendered ineffective assistance by summarizing his criminal record during opening and by failing to object when Tina testified about his criminal history.

{¶ 137} During opening, Johnson's counsel stated the following: "[Tina] knew that Marvin had a criminal past. She knew that in 1989 in Alabama he had been convicted of arson. She also knew that he used illegal drugs such as crack cocaine but with all those short comings she still permitted him to become a part of her family." He then listed Johnson's convictions and stated that while he served various prison sentences for these convictions, "Tina continues to maintain contact with him by telephone or letter, they continue their relationship during those hard times."

{¶ 138} Counsel connected Johnson's prior convictions with Tina's willingness to support him, to maintain a relationship and to take him back upon his release from prison. This does not objectively fall below a reasonable standard of representation, particularly if defense counsel expected the state to raise his prior convictions later in trial. See *State v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484. Moreover, in light of the overwhelming evidence of Johnson's guilt, he cannot show that these statements prejudiced him. Thus, he did not receive ineffective assistance in this instance.

{¶ 139} Third, Johnson complains that his counsel failed to object to Tina's testimony about Daniel's honor-student status and his hobbies, failed on three occasions to object to hearsay, and failed to object to testimony about Johnson's prior convictions. However, "failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel. To prevail on such a claim, a defendant must first show that there was a substantial violation of any of defense counsel's essential duties to his client and, second, that he was materially prejudiced by counsel's ineffectiveness." *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. Johnson does not explain how these alleged failures constituted a violation of his counsel's duties or caused prejudice in light of the evidence against him.

{¶ 140} As the United States Court of Appeals for the Sixth Circuit has recently explained, "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have

been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Lundgren v. Mitchell* (C.A.6, 2006), 440 F.3d 754, 774. Accord *State v. Campbell* (1994), 69 Ohio St.3d 38, 52–53, 630 N.E.2d 339.

{¶ 141} Our review of the trial transcript reveals no such failure by Johnson's trial counsel, and we overrule his claim of ineffective assistance based on these incidents.

{¶ 142} Fourth, Johnson complains that when the state concluded direct examination of each witness, defense counsel failed to ask to review the witnesses' statements, pursuant to Crim.R. 16(B)(1)(g). "[T]he burden of proving ineffectiveness is on the defendant." *State v. Lott* (1990), 51 Ohio St.3d 160, 175, 555 N.E.2d 293, citing *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. However, Johnson fails to show prejudice because he does not explain whether any of the witness statements would have been discoverable or proven useful for impeachment during the trial. Hence, he fails to show ineffective assistance of counsel on this point.

{¶ 143} Fifth, Johnson contends that his counsel indicated to the trial judge that Johnson could not be truthful. This allegation concerns Johnson's desire to testify during the guilt phase of his trial, and defense counsel's statement to the court—outside the presence of the jury—that ethically, he could not question Johnson on direct examination because he did not know what Johnson intended to say or whether Johnson's testimony would be truthful.

{¶ 144} Johnson claims prejudice from his counsel's statement because it implied that he intended to commit perjury. However, the record shows that counsel specifically disavowed knowing what Johnson intended to say and therefore represented to the court his reasons for not wishing to have Johnson testify. Johnson is unable to demonstrate ineffective assistance in this instance.

{¶ 145} Johnson also claims that his counsel violated the attorney-client privilege when he stated that he did not know what Johnson intended to say, but fails to cite authority for that proposition and gives no explanation of how the statement violated the privilege or amounted to ineffective assistance of counsel.

{¶ 146} Sixth, Johnson contends that his counsel should have objected to an allegedly erroneous jury instruction defining "purposely" for the two aggravated-murder charges and the rape charge. The trial court's instruction included both the specific-intention portion of the definition of purpose and the gist-of-the-offense portion of the definition from R.C. 2901.22(A). As we discuss in connection with his 12th proposition of law, however, no prejudice resulted from this

instruction, because the jury found that Johnson had killed Daniel with prior calculation and design, and the jury therefore necessarily found that he had acted with specific intent. As for the rape charge, "the act itself is all that must be intended." *State v. Wilkins* (1980), 64 Ohio St.2d 382, 386, 18 O.O.3d 528, 415 N.E.2d 303. No prejudicial error flowed from counsel's failure to object to the instruction.

{¶ 147} Johnson also argues that counsel should have sought an instruction on the capital specification, the appropriate findings the jurors were to make, and an instruction defining the term "while." As we discussed in the 15th proposition of law, the court did define the term "while." For the remainder of the alleged errors, Johnson does not set forth what specific instructions counsel should have requested or how they caused him prejudice in light of the evidence against him. Our review does not reveal any ineffective assistance of counsel in this regard.

### D. Competency Hearing

{¶ 148} Johnson contends that when the trial court ordered a competency hearing after the guilt phase, defense counsel should have requested the appointment of a defense psychiatrist, pursuant to *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53. That failure, he claims, resulted in his inability to present evidence at that competency hearing.

{¶ 149} Johnson's position is untenable for two reasons. First, though we agree with Johnson that *Ake* "requires that a State provide access to a psychiatrist's assistance" on the issue of his competence, id., 470 U.S. at 74, 105 S.Ct. 1087, 84 L.Ed.2d 53, *Ake* did not entitle Johnson to a psychiatrist of his choice. Id. at 83, 105 S.Ct. 1087, 84 L.Ed.2d 53. The trial court directed the Forensic Diagnostic Center to evaluate Johnson's competence, and a psychologist from that facility found Johnson to be competent.

{¶ 150} Second, the record reveals that defense counsel did request the appointment of a forensic psychologist by motion on October 6, 2003, and, in response to that motion, the court appointed Dr. Richard E. Jackson on October 20, 2003, more than six months before the competency hearing occurred. Because Johnson alleges nothing regarding Dr. Jackson's competence, and because Johnson stated on the record that he did not want to undergo the court-ordered competency evaluation at the close of the guilt phase, his defense counsel committed no error with regard to Johnson's rights under *Ake*. Therefore, the claim of ineffective assistance of counsel fails.

### E. Penalty Phase

{¶ 151} Johnson also contends that his counsel rendered ineffective assistance during opening statements of the penalty phase of the trial. Counsel stated that the defense faced "an uphill battle" and warned the jurors that they were "going

to be emotionally affected" by having seen photographs of the victim during the guilt phase. Johnson also complains that his counsel said, "I'm suppose[d] to know what I'm doing and I think I do," and "We are going to try to be as honest with you as we can."

{¶ 152} These statements do not reflect deficient performance. Instead, they reflect counsel's attempt to build a rapport with the jury, and even "debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 430, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, citing *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45; *State v. Campbell* (2000), 90 Ohio St.3d 320, 339, 738 N.E.2d 1178. And "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 153} Finally, Johnson points to defense counsel's failure to object to an erroneous verdict form. However, as we discussed in connection with Johnson's 17th proposition, no prejudicial error resulted from this omission.

{¶ 154} Accordingly, as none of Johnson's ineffective-assistance claims have merit, we overrule this proposition of law.

### Inquiry into Defendant's Competence

{¶ 155} In his second proposition of law, Johnson contends that the trial court abused its discretion by failing to hold a timely hearing on his competence to stand trial.

{¶ 156} Johnson contends that the trial court should have granted defense counsel's May 13, 2004 oral request for a competency evaluation in light of Johnson's actions leading up to and during the trial. He cites the following instances in support of the need to conduct a hearing: his attempt to fire his attorneys; his statements to the court regarding his belief that the newspapers misquoted him; his expression to the court of his desire to receive the death penalty; and his May 13 demand to testify and proceed pro se after defense counsel rested.

{¶ 157} At that time, counsel moved for the competency hearing, and the court conducted its own examination of Johnson to determine his competence to stand trial. In response to the court's questions, Johnson accurately recited the charges against him and acknowledged the possibility of a death sentence, and he acknowledged that he understood the stage of the proceedings and that his testimony, argument, and questioning of witnesses would be governed by rules. Johnson also stated that he had spoken with his counsel and that he understood that his counsel had advised him against testifying or representing himself. Johnson nonetheless reaffirmed his desire to testify and to represent himself.

{¶ 158} Defense counsel moved again for a competency hearing, but the court concluded, "I have no reason to believe that you are not proceeding competently. You may not be proceeding wisely but there is no requirement of that in the law. * * * The Court finds the defendant competent. If he wishes to testify in this matter that is also his constitutional right." The court then granted a recess for Johnson to confer with his counsel before proceeding.

{¶ 159} In *State v. Barton,* 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 56, we stated, "R.C. 2945.37(G) creates a rebuttable presumption that a defendant is competent to stand trial. 'This presumption remains valid under R.C. 2945.37(G) unless, "after a hearing, the court finds by a preponderance of the evidence" that the defendant is not competent.' *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 74, quoting R.C. 2945.37(G). The 'decision as to whether to hold a competency hearing once trial has commenced is in the court's discretion.' " Id., quoting *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401.

{¶ 160} "The right to a hearing 'rises to the level of a constitutional guarantee where the record contains "sufficient indicia of incompetence," such that an inquiry * * * is necessary to ensure the defendant's right to a fair trial.' " *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 156, quoting *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, and citing *Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103, and *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815. And "[i]ncompetency is defined in Ohio as the defendant's inability to understand ' * * * the nature and objective of the proceedings against him or of presently assisting in his defense.' " *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016, quoting R.C. 2945.37(A).

{¶ 161} The trial court did not abuse its discretion by denying counsel's May 13, 2004 motion for a competency evaluation, because the indicia of incompetence did not rise to a level that demanded a hearing or an evaluation. Johnson's anger regarding the newspaper articles, his refusal to heed his counsel's advice, and his abandoned request to fire his counsel did not indicate that he was unable to understand the nature of the charges and proceedings or the gravity of the situation or that he could not assist in his defense. Even Johnson's desire to receive the death penalty did not necessarily signal incompetency. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 29, 553 N.E.2d 576 ("even if a capital defendant waives mitigation completely because he wants to be executed, that waiver does not by itself call his competence into question").

{¶ 162} We view these alleged indicators in light of Johnson's responses to the court in which he expressed his understanding of the nature of the charges against him, the possibility of the death penalty for these charges, the ramifica-

tions of both testifying and representing himself, and the need to follow the rules. The court satisfied itself of Johnson's competence, and, in such matters, we defer to those "who see and hear what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

{¶ 163} We acknowledge that on May 13, defense counsel informed the court of Dr. Jackson's expected diagnosis that Johnson suffered "paranoid personality disorder [and] reality contact problems." But the diagnosis said nothing of Johnson's competence. As we have previously held, "[a] defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *Bock*, 28 Ohio St.3d at 110, 28 OBR 207, 502 N.E.2d 1016. Moreover, at the time it denied the defense's May 13 motion for a competency evaluation, the trial court had before it only defense counsel's assertions regarding Dr. Jackson's diagnosis, not evidence thereof.

{¶ 164} As a result, the trial court did not abuse its discretion when it denied defense counsel's motion for a competency evaluation during trial on May 13, 2004.

{¶ 165} Four days later, the court did grant the defense's subsequent motion for a mental evaluation and a competency hearing. Johnson contends that the court abused its discretion by waiting until that point to order the hearing.

{¶ 166} On Monday, May 17, 2004, between the guilt and penalty phases of the trial, defense counsel informed the court that they had learned over the weekend that Dr. Jackson, the appointed defense psychologist, had "found symptoms consistent with severe mental illness." Counsel also related to the court that Johnson had called three times and had made statements that led counsel to question his competence. The defense renewed its motion for a mental evaluation of Johnson and a competency hearing, and the court granted it, ordering the Forensic Diagnostic Center to perform the evaluation.

{¶ 167} At the competency hearing, held May 26, 2004, the parties stipulated to Dr. Denise Kohler's report, dated May 22, 2004, in which she found Johnson competent to stand trial, as he "is capable of understanding the nature and the objectives of the proceedings against him and of assisting in his defense." The defense submitted no evidence at the hearing. Based on this report, the trial court deemed Johnson competent and continued with the penalty phase of the trial.

{¶ 168} Johnson argues that Dr. Kohler's evaluation occurred too late to detect his incompetency. He refers to Dr. Jackson's penalty-phase testimony that, under stress, his mental disorders could alter his perception of reality. Because such stress may not have existed at the time Dr. Kohler evaluated him, he argues, Dr. Kohler's evaluation inaccurately determined him competent.

{¶ 169} The record before us does not substantiate Johnson's claim. In his report, Dr. Jackson opined that in "moderate to high stress situations, anger, suspiciousness and distress/depression *can contribute* to extreme agitation and *possible* atypical perception." (Emphasis added.) However, not only does this evidence fail to address Johnson's *competency,* the evidence fails to suggest what Johnson's competency *would have been* four days earlier, when Johnson believes he should have been evaluated.

{¶ 170} This situation is analogous to that in *State v. Ferguson,* 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 55, in which we rejected a defendant's claim that the court erred by failing to order additional testing because "[i]t is purely speculative whether additional testing would have made any difference in the outcome of [the defendant's] competency evaluation."

{¶ 171} Similarly, we reject Johnson's claim that an earlier evaluation would have revealed his incompetency, as it rests upon speculation and has no basis in the record before us.

{¶ 172} The second proposition of law is overruled.

Voir Dire Issues

A.  Interruptions by Trial Judge

{¶ 173} In his third proposition of law, Johnson contends that the trial court disproportionately interrupted defense counsel during voir dire, suggesting to the veniremen that the judge thought the defense inept.

{¶ 174} This argument lacks merit. The record reveals that during the week-long voir dire, the court interrupted defense counsel 29 times and the state 12 times. Of the former, the court interrupted several times to note something for the record, to ask questions of its own, or to clarify the law for a prospective juror. The trial judge did rephrase or clarify several defense questions, but the court's opinion regarding defense counsel's competence cannot be inferred from anything in this record.

{¶ 175} We distinguish this case from *United States v. Hickman* (C.A.6, 1979), 592 F.2d 931. There, the trial judge dominated a one-day trial with "constant interruptions," exhibited a consistently anti-defense tone, interfered with defense cross-examination, and attacked the credibility of defense witnesses. Id. at 934–936. In this case, the court's interruptions did not have the same character as in *Hickman,* and they occurred during the course of a week-long voir dire that generated around 900 pages of transcript. The interruptions "did not pervade the trial" and "probably left little impression on the jury." *State v. Sanders* (2001), 92 Ohio St.3d 245, 278, 750 N.E.2d 90.

{¶ 176} This proposition is overruled.

### B. Limitation on Voir Dire

{¶ 177} In the fourth proposition of law, Johnson contends that the court denied defense counsel the opportunity to "conduct a thorough and searching voir dire."

{¶ 178} During voir dire of the first group of veniremen, defense counsel asked them to identify their favorite television shows, their heroes, and their hobbies. The trial judge mistakenly thought that these questions had been asked on the questionnaires completed by each prospective juror, and he stated that, if they wished, they could refer counsel to their questionnaires for the answers. The questionnaires, however, did not inquire about television shows, heroes, or hobbies.

{¶ 179} Johnson fails to explain how the court's mistaken belief or counsel's inability to inquire into those topics prevented him from revisiting the topics upon learning that the information did not appear in the questionnaires. Moreover, information about prospective jurors' "personal habits and activities" is "not needed to compose a fair-minded jury." *United States v. Phibbs* (C.A.6, 1993), 999 F.2d 1053, 1071. See, also, *United States v. Serafini* (M.D.Pa.1999), 57 F.Supp.2d 108, 114 (such information has "marginal pertinence" and "no evident link with fairness"); *United States v. McDade* (E.D.Pa.1996), 929 F.Supp. 815, 819 (such information "sheds no real light on" juror bias). Due process confers no right "to mold the jury in [such] a way that the jury will be receptive to counsel's case." *United States v. Padilla–Valenzuela* (D.Ariz.1995), 896 F.Supp. 968, 972.

{¶ 180} We overrule this proposition.

### C. Overruled Challenges for Cause

{¶ 181} In his sixth proposition, Johnson contends that the trial court erred in overruling his challenges for cause of prospective jurors Craig, Kritz, and Bumgardner, which required him to excuse them by preemptory challenge.

{¶ 182} Generally, the denial of a challenge for cause does not violate a defendant's constitutional rights. See *Ross v. Oklahoma* (1988), 487 U.S. 81, 88–89, 108 S.Ct. 2273, 101 L.Ed.2d 80. However, because Johnson exhausted his peremptory challenges, we consider the merits of his claim. See *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 61; *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144.

{¶ 183} A trial court's resolution of a challenge for cause will be upheld on appeal unless the trial court abused its discretion. *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915.

### 1. Craig

{¶ 184} Prospective juror James Craig disclosed on voir dire that, in 1978, his sister had been charged with "a crime with a lot of the same characteristics as this. * * * There was drugs involved, it was interracial, there was a kidnapping * * *." Asked if this background would bias him in favor of either party, Craig stated: "If I had to say I probably would be for the State of Ohio. * * * I feel I would try to be fair but I don't know * * * that I could be completely fair."

{¶ 185} Yet, in response to a query about how his sister's experience would affect his deliberations, Craig said: "*I will follow the law.* Whatever the Judge tells me I will do my very best to follow it." (Emphasis added.) Although he could not "erase [his] memories" of his sister's case, he pledged to "do [his] level best" not to consider those memories in deliberations.

{¶ 186} The defense challenged Craig for cause, but the trial court overruled the challenge, noting that Craig had raised the issue himself and describing him as "forthright in his answers."

{¶ 187} The record supports the court's decision. "Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially." *Patton v. Yount* (1984), 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847.

{¶ 188} We agree that due process entitles a defendant "to a jury that will hear his case impartially, not one that tentatively promises to try." *Wolfe v. Brigano* (C.A.6, 2000), 232 F.3d 499, 503. However, Craig did not promise to try to be impartial. He said: "I will follow the law." He added that he would "do his very best" and his "level best" to disregard his sister's experience, which occurred 26 years prior.

{¶ 189} Thus, we distinguish this case from *Wolfe,* in which three prospective jurors offered "tentative statements" that they would "try to decide [the] case on the evidence presented at trial." 232 F.3d at 503. Moreover, as the trial court in this case noted, Craig raised the issue on his own initiative. On this record, the trial judge could reasonably conclude that Craig understood his obligation to disregard his sister's experience and render a verdict free of any prejudgment. The substantial testimony here supports the court's ruling.

### 2. Kritz

{¶ 190} Prospective juror Phyllis Kritz initially said she thought she could recommend a life sentence if the aggravating circumstances did not outweigh the

mitigating factors. Under defense examination, she said that the proper sentence should be death when the jury convicts a person of aggravated murder with prior calculation and design. She further stated that her views would substantially impair her ability to consider any punishment but death for premeditated murder.

{¶ 191} However, Kritz later contradicted these statements when she affirmed that she would listen to the mitigating evidence and fairly consider it. The trial court also asked Kritz whether she could recommend a lesser sentence than death if aggravation failed to outweigh mitigation. Kritz replied, "After thinking about it * * * I understand more and all and I could do that. * * * I would do that. Yes. Yes."

{¶ 192} The questioning reveals this prospective juror's greater understanding of her role as a juror and her willingness to follow the law as voir dire progressed. As we held in *State v. Treesh* (2001), 90 Ohio St.3d 460, 468, 739 N.E.2d 749, "even if a juror shows a *predisposition* in favor of imposing the death penalty, the trial court does not abuse its discretion in overruling a challenge for cause if the juror later states that she will follow the law and the court's instructions." (Emphasis sic.)

{¶ 193} Based on our review of the record, the trial court did not abuse its discretion in denying this challenge for cause.

### 3. Bumgardner

{¶ 194} Prospective juror Delbert Bumgardner, a prison guard, had been fired from his job and faced a misdemeanor charge based on the allegation that he had assaulted an inmate. However, the Ohio Department of Rehabilitation and Correction later reinstated him to his position, and the state dropped the charge.

{¶ 195} On voir dire, Bumgardner expressed a willingness to consider mitigating factors, but stated that such factors would have to outweigh the aggravating circumstances to justify a life sentence. The trial judge explained to Bumgardner, "[I]f we get to the second phase, mitigation or sentencing phase, the jurors will be instructed * * * that they are to weigh all of the mitigating factors that have been presented and they must then make a determination if the *aggravating circumstances* * * * *outweigh* beyond a reasonable doubt any of *the mitigating factors.*" (Emphasis added.) Bumgardner promised to follow this instruction.

{¶ 196} The judge then asked: "[W]ould you shift the burden of proof, to the defendant and make him prove that the mitigating factors outweigh the aggravating circumstances beyond a reasonable doubt?" Bumgardner replied: "I believe I said he would have to prove them but what I meant was—it's hard for me to describe * * *—basically the prosecution has to prove everything to me and if they don't prove their case to me all the way through then I don't have a problem

giving Mr. Johnson life sentence or otherwise." He also answered "Yes, sir" when the trial judge asked whether he understood that "the burden of proof is on the State of Ohio throughout this case."

{¶ 197} The defense challenged Bumgardner for cause on three grounds: first, his initial statement that mitigating factors would have to outweigh aggravating circumstances to justify a life sentence; second, a claim of personal hostility toward defense counsel; and third, an argument that there must be "some evidence" that Bumgardner had assaulted a prisoner or else he would not have been prosecuted or fired.

{¶ 198} The trial court overruled the challenge, specifically rejecting the assertion that Bumgardner had displayed hostility to counsel. The judge also determined that neither Bumgardner's employment nor the dismissed assault charge constituted cause to excuse him.

{¶ 199} On appeal, Johnson reasserts his three claims regarding Bumgardner. However, we affirm the trial court's decision based on the record before us.

{¶ 200} As with Craig, the transcript supports the court's conclusion that Bumgardner's responses do not exhibit bias or an inability to consider the evidence and apply the correct standards of law. Nothing in the record contradicts this conclusion. Similarly, other than defense counsel's statements to the court, the record does not reveal that Bumgardner exhibited hostility toward defense counsel. The court stood in the best position to observe Bumgardner and his behavior; it detected no hostility, and no evidence exists on which to dispute that finding. See *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 ("deference must be paid to the trial judge who sees and hears the juror").

{¶ 201} Finally, no inference of bias or an inability to perform the duties of a juror arises from the fact that Bumgardner, a prison guard, faced a charge, later dropped by both the state and his employer, that he assaulted an inmate. The court stated, "He did answer he would follow the law and I carefully reviewed it with him again. * * * I do not find just because one is a corrections officer that it is basis to be excused and he advised the charges were dismissed against him. It may well be that he is also sympathetic to those who have had charges brought against them."

{¶ 202} The record reveals nothing that contradicts the court's findings.

{¶ 203} As the evidence in the record supports the court's decisions, the trial court did not abuse its discretion in denying the three challenges for cause, and we overrule this proposition of law.

Evidence Issues

A. Evidence Relating to Victim

{¶ 204} In his eighth proposition, Johnson contends that, during the guilt phase of the trial, the jury heard irrelevant and prejudicial testimony about Daniel. Specifically, Johnson objects to the state's description of Daniel and his activities during opening statements, to Tina's testimony about Daniel's hobbies and interests, and to the fact that Tina had a picture of Daniel with her while she testified.

{¶ 205} The record shows that in its opening statement, the state mentioned the following about Daniel: his age, where he went to school, his grade level, his status as an honor-roll student, that he played football and video games, that he liked watching a variety of sports, that he had a paper route, that he was interested in cars, and that he had a younger sister.

{¶ 206} Tina's testimony consisted of the following:

{¶ 207} "Q: I want to ask you some questions, Tina, about Daniel. He would be in what grade?

{¶ 208} "A. This year would have been in 8th grade.

{¶ 209} "Q. And where did he go to school?

{¶ 210} "A. Cambridge Middle School.

{¶ 211} "Q. Was he a good student?

{¶ 212} "A. Daniel was an honor student.

{¶ 213} " * * *

{¶ 214} "Q. What were his hobbies?

{¶ 215} "A. Daniel loved working on the computer. He spent a lot of time on the computer.

{¶ 216} "Q. Did you buy him a computer?

{¶ 217} "A. Yes, I did. I believe it was in March he asked for a Dell computer and together we ordered that on-line and we pretty much everything he requested.

{¶ 218} "Q. He also had some other—I see you have a picture of him in a football uniform.

{¶ 219} "A. Yes, I do.

{¶ 220} "Q. And in Cambridge we have biddy league football.

{¶ 221} "A. Biddy league football.

{¶ 222} "Q. Did he play football?

{¶ 223} "A. He played in the sixth grade.

{¶ 224} "Q. He enjoyed other sports?

{¶ 225} "A. He played basketball.

{¶ 226} "Q. And he also was developing a hobby I think you said in detailing cars?

{¶ 227} "A. He was trying to start a little business detailing cars. He had produced his own flyers to include in the newspapers that he delivered and he actually had customers request his services."

{¶ 228} Johnson argues that this testimony, and the relevant portion of the state's opening, constitute irrelevant, prejudicial character evidence. However, because he did not object, Johnson waived all but plain error. See *State v. Davie* (1997), 80 Ohio St.3d 311, 325, 686 N.E.2d 245; *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675.

{¶ 229} Having reviewed the record, we disagree with Johnson's contention that none of the statements had any relevance. For example, Tina's testimony about Daniel's interest in computers explained why he stayed up late at night while she worked and why he would call her around 4:00 or 5:00 in the morning, which in turn helped establish the time of death. See *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 55–57. That she bought him a computer and helped him pick it out provided background for their relationship and helped to explain Johnson's resentment toward Daniel. The picture helped to identify Daniel. And as we observed in *Noling*, these types of evidence "simply establish[ ] that the [victims] had been living persons, an element of the aggravated murder charge." Id. at ¶ 56.

{¶ 230} In *State v. Smith* (1997), 80 Ohio St.3d 89, 107, 684 N.E.2d 668, we stated that "proving the facts of a murder necessarily involves disclosure of details as to the victims and their lives. 'The victims cannot be separated from the crime.'" Id., quoting *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212.

{¶ 231} Finally, as in *Smith*, "the references to the victims' background were minimal and relatively innocuous." *Smith*, 80 Ohio St.3d at 107, 684 N.E.2d 668. The state did not dwell upon either Daniel's background or his picture, and neither the state nor Tina used inflammatory or emotional language to describe Daniel's background.

{¶ 232} In other cases, we concluded that plain error did not occur, and we reach the same conclusion here. In light of the evidence against Johnson, any error with regard to character evidence did not affect the outcome of the trial.

{¶ 233} We overrule Johnson's eighth proposition.

## B. Jailhouse Informant

{¶ 234} In his ninth proposition of law, Johnson contends that the state violated his Sixth Amendment right to counsel by assigning informant Mickey Alexander as his cellmate in the Guernsey County Jail in order to obtain statements from him after his right to counsel attached. Although the state did not introduce Johnson's statements at trial, Johnson claims that the statements he made to Alexander led to the discovery of the following three exhibits for the state: the $1,000 that Johnson hid in the park, the key to Tina's house in Johnson's wallet, and the shoes from Lisa Wilson. He argues that these items should be suppressed as "fruit of the poisonous tree."

{¶ 235} However, the record demonstrates that Johnson volunteered the information to the informant. In such cases, "a defendant does not make out a violation of [the Sixth Amendment] right [to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson* (1986), 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364; cf. *United States v. Henry* (1980), 447 U.S. 264, 271, 100 S.Ct. 2183, 65 L.Ed.2d 115 (right to counsel violated where informant "was not a passive listener" but took "affirmative steps to secure incriminating information").

{¶ 236} The record does not support Johnson's claim. At a pretrial suppression hearing, Alexander testified that the police never asked him to question Johnson or initiate any conversations and that he never asked Johnson any questions about his case, but only listened to what Johnson volunteered. Alexander also testified that he came to be assigned to Johnson's cell because he and Johnson had known each other for several years, and Johnson requested that Alexander be assigned to his cell. Only Alexander testified at the suppression hearing, and nothing in the record contradicts his testimony.

{¶ 237} Because the record does not reveal that Alexander did anything but listen to what Johnson volunteered to him, the trial court did not err in denying Johnson's suppression motion. Hence, we overrule Johnson's ninth proposition.

## C. In Camera Inspection of Police Report

{¶ 238} In his 11th proposition of law, Johnson contends that, pursuant to Crim.R. 16(B)(1)(g), the trial court should have conducted an in camera inspection of the police reports prepared by Detective Brian Harbin, who testified at trial.

{¶ 239} As we held in *State v. Keenan* (1998), 81 Ohio St.3d 133, 147, 689 N.E.2d 929, "Under Crim.R. 16(B)(1)(g), after a witness's direct examination,

opposing counsel may request an *in camera* inspection of the witness's 'written or recorded statement' to determine whether it is inconsistent with his testimony."

{¶ 240} This case presents a situation identical to that in *Keenan*: Johnson failed to make Detective Harbin's report a part of the record, and he failed to object to its omission. As we wrote in *Keenan*, "[r]eview of this issue is therefore impossible. * * * Consequently, he has waived this issue." Id., citing *State v. Jenkins* (1984), 15 Ohio St.3d 164, 226, 15 OBR 311, 473 N.E.2d 264.

### Trial-Administration Issues

### A. Stun Device

{¶ 241} During his trial, the court required Johnson to wear a security device known as a "stun belt," though he wore it on his leg rather than his waist. The record does not reveal that the court heard evidence to justify the use of this restraint, and the court did not state its reasons for ordering Johnson to wear it. In his seventh proposition of law, Johnson contends that the trial court erred by requiring him to wear this device without first conducting a hearing.

{¶ 242} He relies on *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, in which the defendant objected to the court's order to wear a stun belt and challenged the court's justification for the device. In considering that claim, we observed that "[c]ourts elsewhere have upheld the use of electronic stun belts when specifically justified" and that "courts have reversed when stun belts have not been amply justified on the record." Id. at ¶ 105. We implicitly agreed that stun-belt restraints must be justified, and our review of the record revealed that the trial court held a hearing on the need for a stun belt and that the evidence presented justified the court's order. Id. at ¶ 106–110.

{¶ 243} We agree with Johnson that the trial court erred, pursuant to *Adams.* However, because Johnson neither objected to the court's order nor requested a hearing on the matter, *Adams* is inapposite.

{¶ 244} Generally, the failure to object waives the error and requires the aggrieved party to demonstrate prejudice. Other courts addressing this issue in the context of a stun-belt order have applied this type of review. For example, in *Adams,* at ¶ 105, we cited both *Scieszka v. State* (2003), 259 Ga.App. 486, 578 S.E.2d 149, and *Simms v. State* (Tex.App.2004), 127 S.W.3d 924; in both cases, the courts rejected the defendants' claims because they failed to object and because the respective records contained no evidence of prejudice.

{¶ 245} In *Hernandez–Reyes v. Lampert* (C.A.9, 2004), 105 Fed.Appx. 916, 917–918, 2004 WL 1687945, the Ninth Circuit rejected the defendant's claim regarding the use of a stun belt for two reasons: First, "Hernandez–Reyes' failure to object to the restraining device negates the presence of compulsion necessary to establish a due process violation" and, second, "he has not shown

that he was prejudiced by wearing the device during his trial. A defendant's restraint at trial is subject to harmless error analysis. * * * As such, we must determine whether the error had a 'substantial and injurious effect on the jury's verdict.'" Id., quoting *Ghent v. Woodford* (C.A.9, 2002), 279 F.3d 1121, 1132 fn. 9. The court determined that the error had no effect. Id.

{¶ 246} The Supreme Court of Illinois recently held the following in regard to a trial court's order for the defendant to wear a stun belt: "although the failure to conduct a * * * hearing under these circumstances is an error, defendant's failure to object and to carry his burden of persuasion amounts to forfeiture of the error, where he cannot establish that it prevented him from obtaining a fair trial." *People v. Allen* (2006), 222 Ill.2d 340, 305 Ill.Dec. 544, 856 N.E.2d 349, citing *Estelle v. Williams* (1976), 425 U.S. 501, 512–513, 96 S.Ct. 1691, 48 L.Ed.2d 126.

{¶ 247} Therefore, in light of these decisions and our holding in *Adams*, we hold that although a trial court errs when it orders a defendant to wear a stun belt without sufficient justification in the record, the defendant waives the error by failing to object. Thus, we turn to the record in this case to determine whether Johnson suffered prejudice due to the stun belt.

{¶ 248} The record contains no evidence that indicates the jury could see or had any knowledge of the stun belt that Johnson wore on his leg. The court ordered Johnson to wear the stun belt under civilian clothing that defense counsel had purchased with court funds, and the court reminded counsel to buy pants large enough to accommodate it. The court noted that it could not see the device and that, during trial, the defendant sat behind an enclosed desk or table.

{¶ 249} The record does not reveal that the device caused Johnson any physical discomfort. When the trial judge asked, "Are you able to wear that device?" Johnson answered, "Yes." The record does not reveal that the stun belt increased any risk of injury to Johnson or that it caused him any nervousness or other psychological distress. Nothing in the record suggests that the device in any way inhibited Johnson's ability to consult with his counsel or assist in his defense. No evidence exists that the stun belt ever activated during trial.

{¶ 250} We conclude that this record does not show prejudice in this regard. See, e.g., *United States v. McKissick* (C.A.10, 2000), 204 F.3d 1282, 1299 (no evidence that the jury knew about the device); *United States v. Joseph* (C.A.5, 2003), 333 F.3d 587, 591 (the jury could not see the device, and the device did not activate during trial); *Washington v. Florida Atty. Gen.* (Oct. 13, 2005), M.D. Florida No. 604CV1355ORC79KES, 2005 WL 2580686 (no evidence that the jury knew of the stun belt or that it caused the defendant physical discomfort); *Scieszka*, 259 Ga.App. at 487, 578 S.E.2d 149 (same); *Simms*, 127 S.W.3d at 928–929 (the jury could not see stun belt); *Allen*, 222 Ill.2d 340, 305 Ill.Dec. 544, 856

N.E.2d 349 (the trial court took care to prevent the jury from seeing the stun belt; no evidence of distress, nervousness, or that the device hindered the defense).

{¶ 251} In the absence of any evidence in the record that the stun belt prejudiced Johnson, we overrule this proposition of law.

### B. Spectator Outburst

{¶ 252} In his tenth proposition, Johnson contends that an emotional outburst by a spectator, Utelius Barnes, tainted his trial.

{¶ 253} While representing himself, Johnson called Tina Bailey as a defense witness. In his final question, he asked her: "Do you recall times after sex with me * * * that you would, after finished, you would get up and go to the window? * * * You remember that feeling? That's what it felt like to beat your son in the f* * *ing head."

{¶ 254} Barnes, a spectator in the courtroom, shouted at Johnson, "I'll kick your f* * *ing ass." The court ordered him removed, and it admonished the jury to "judge the credibility of the witness that has just testified and not the defendant who was asking the questions." Shortly thereafter, the court recessed for the day, but, before adjourning, it addressed the jury:

{¶ 255} "Now, ladies and gentlemen of the jury, I need to have your promise and commitment to me under your oath as jurors that you will judge this case fairly and impartially on the facts presented by the testimony of the witnesses and not by any questions that have been asked. Will you promise me that you will do that?" The jurors promised.

{¶ 256} Although the court did not, at that time, give a specific instruction to disregard Barnes's outburst, it did so when instructing the jury at the close of the guilt phase. On request of the defense, the court gave the following instruction:

{¶ 257} "During the trial we had a witness and an outburst as part of a spectator [Barnes], the witness who had testified in the trial briefly and was seated in the courtroom. The outburst is such that you are instructed to totally disregard what you heard or saw in the courtroom and decide this case only on the basis of the evidence adduced during the course of the trial.

{¶ 258} "Ladies and gentlemen of the jury, may I have your individual promises that you will do that by advising me affirmatively or negatively?

{¶ 259} "JURORS: Yes."

{¶ 260} When an emotional outburst takes place in court, the issue is whether the outburst "deprived the defendant of a fair trial by improperly influencing the jury." *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. This "is a factual question to be resolved by the trial court, whose determination

will not be overturned absent clear, affirmative evidence of error." *State v. White* (1999), 85 Ohio St.3d 433, 440, 709 N.E.2d 140.

{¶ 261} "Normally, only the trial judge can make the necessary factual determinations on these questions. '[H]is findings thereon will not be disturbed on review in the absence of evidence on the face of the record clearly and affirmatively showing that the jury was improperly affected * * *.'" *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068, quoting *State v. Bradley* (1965), 3 Ohio St.2d 38, 41, 32 O.O.2d 21, 209 N.E.2d 215.

{¶ 262} The record does not "clearly and affirmatively" reveal that Barnes's outburst had any effect on the jury. Moreover, the trial court's admonitions focused the jury on the evidence and away from the outburst. Cf. *Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 48 (court cautioned jurors to "focus on the evidence and to disregard extrinsic matters").

{¶ 263} Furthermore, we reject Johnson's argument that, pursuant to *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654, the trial court should have conducted a hearing to determine the outburst's effect. A *Remmer* hearing must be held when the trial court learns of "private communication, contact, or tampering * * * with a juror during a trial about the matter pending before the jury." *Remmer*, 347 U.S. at 229, 74 S.Ct. 450, 98 L.Ed. 654.

{¶ 264} However, "[w]here the communication is innocuous and initiated by a spectator in the form of an outburst, a hearing is not necessarily required." *White v. Smith* (C.A.6, 1993), 984 F.2d 163, 166. An in-court emotional outburst directed at the defendant, not the jury, "is a situation quite unlike the private communication with the jury encountered in *Remmer*. The * * * outburst was not 'a purposeful intrusion into the sanctity of the juror's domain.'" *Whitehead v. Cowan* (C.A.7, 2001), 263 F.3d 708, 724, quoting *Schaff v. Snyder* (C.A.7, 1999), 190 F.3d 513, 534.

{¶ 265} We overrule the tenth proposition of law.

### Jury Instructions

#### A. Lesser Included Offense

{¶ 266} In his 16th proposition of law, Johnson claims that the trial court should have instructed the jury on sexual battery, R.C. 2907.03(A)(1), a lesser included offense of rape.

{¶ 267} The state charged Johnson with rape under R.C. 2907.02(A)(2), which provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Sexual battery, as defined by R.C. 2907.03(A)(1), takes place when "[t]he

offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution."

{¶ 268} Rape requires the use of "force or threat of force" to compel the victim's submission, while sexual battery requires only coercion. Because "force or threat of force always constitutes coercion," an offender cannot commit rape under R.C. 2907.02(A)(2) without also committing sexual battery under R.C. 2907.03(A)(1). *State v. Wilkins* (1980), 64 Ohio St.2d 382, 386, 18 O.O.3d 528, 415 N.E.2d 303. However, the state need not prove force or the threat of force in order to prove sexual battery. Therefore, sexual battery, as defined by R.C. 2907.03(A)(1), constitutes a lesser included offense of rape as defined by R.C. 2907.02(A)(2). Id.

{¶ 269} An instruction regarding a lesser included offense must be given "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286. Thus, the failure to instruct on the offense of sexual battery constitutes error only if the jury could reasonably have found that Johnson compelled Tina to submit by coercion, but not by force or the threat of force. Cf. *Keenan*, 81 Ohio St.3d at 139–140, 689 N.E.2d 929.

{¶ 270} Johnson contends that his implied threat to harm Daniel[1] constituted coercion rather than "threat of force" within the meaning of R.C. 2907.02(A) because he did not threaten to harm *Tina*. Johnson further contends that the jury could have found that Tina had sex with him *solely* because he threatened Daniel and not because he held the knife. Therefore, he claims, the jury could have reasonably found that Tina submitted to his coercion (the threat to Daniel), rather than any threat of force.

{¶ 271} Johnson's argument presupposes that in a prosecution for rape under R.C. 2907.02(A)(2), a threat to harm a person other than the victim of the alleged rape cannot serve as the "threat of force" needed to establish rape. Other courts have rejected that view. See *Crenshaw v. State* (1971), 13 Md.App. 361, 373, 283 A.2d 423 (threat to third person can serve as threat of force for rape); *Fitzpatrick v. State* (1977), 93 Nev. 21, 22, 558 P.2d 630 (same); 2 LaFave, Substantive Criminal Law (2d Ed.2003) 627, Section 17.3(b).

{¶ 272} However, we need not decide today whether a threat of harm to a third party can constitute a "threat of force" for purposes of R.C. 2907.02(A). Johnson had no right to a lesser-included-offense instruction on sexual battery because,

---

1. According to Tina's testimony, Johnson told her that Daniel "would be okay" if she gave in to Johnson's demands; otherwise Johnson "couldn't guarantee" Daniel's safety.

based on the record, the jury could not reasonably have concluded that Tina submitted solely because of the threat to Daniel.

{¶ 273} Tina testified specifically that she would not have performed oral sex on Johnson had he not held the knife to her. Her testimony that she also submitted because of her fear for Daniel does not contradict this. Thus, the record does not support Johnson's claim that Tina submitted *solely* because she feared for Daniel's safety or that Johnson's display of the knife had no impact upon her decision.

{¶ 274} The record supports the conclusion that Tina submitted both because of the threat to Daniel *and* the threat to her own person. Therefore, no error occurred by the failure to instruct on the lesser included offense of sexual battery, and we overrule this proposition of law.

### B. Purpose Instruction

{¶ 275} In his 12th proposition of law, Johnson claims that the trial court erroneously defined the term "purposely" when defining the elements of aggravated murder. The trial court used the "gist of the offense" language found in R.C. 2901.22(A), which Johnson argues should not be given in an aggravated-murder case. See, generally, *State v. Wilson* (1996), 74 Ohio St.3d 381, 393, 659 N.E.2d 292; 4 Ohio Jury Instructions (1995) 58, Comment to Section 409.01(3).

{¶ 276} Johnson failed to object at trial to this instruction. Thus, he waived the alleged error unless it is plain error. *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 56, citing *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Plain error did not occur in this regard.

{¶ 277} In convicting Johnson on Count 2, the jury found that he killed Daniel with prior calculation and design. Such a finding necessarily implies that Johnson had a specific purpose to kill. Thus, had the alleged error not happened, the jury would still have found that Johnson purposely killed Daniel. This proposition is overruled.

### Sentencing Opinion

{¶ 278} In his 20th proposition, Johnson argues that flaws in the trial court's sentencing opinion constitute reversible error.

{¶ 279} Johnson argues that the trial court "weighed a wholly different aggravating circumstance than the jury found in Count Two." The basis for this claim is the error in the verdict form for Count 2. As we previously discussed, Johnson waived that error by failing to object. Further, as we also discussed, nothing in the record suggests that the jury could have found someone else to be the principal offender, and in fact, the jury found Johnson to be the principal

offender with regard to the specification to Count 1, for which the jury received an accurately drafted verdict form.

{¶ 280} Thus, the court did not commit prejudicial error by considering his principal-offender status when weighing the felony-murder specification.

{¶ 281} Johnson further contends that the trial court erroneously weighed two aggravating circumstances against his mitigation. The record supports Johnson's claim, as the trial court appears to have weighed the kidnapping and rape convictions as separate aggravating circumstances in its sentencing opinion. As we observed in *State v. Spivey* (1998), 81 Ohio St.3d 405, 420, 692 N.E.2d 151, fn. 2, when a single R.C. 2929.04(A)(7) specification charges two or more predicate felonies, those felonies must be weighed together as a single aggravating circumstance.

{¶ 282} However, our independent review cures this error by the trial court. See, generally, *Clemons v. Mississippi* (1990), 494 U.S. 738, 745–746, 110 S.Ct. 1441, 108 L.Ed.2d 725; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293.

{¶ 283} Johnson also complains that the sentencing opinion discussed the facts surrounding his offenses. But discussing these facts does not necessarily constitute error, as we held in *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684–685, 687 N.E.2d 1358: "While the trial court discussed the facts surrounding the crime * * * in its opinion, it did not weigh those facts as aggravating circumstances. Instead the court reviewed the nature and circumstances of the crime, as it was required to do pursuant to R.C. 2929.03."

{¶ 284} Here, the trial court did not weigh the facts as aggravating circumstances in contravention of *Reynolds*. Moreover, our independent review cures any error in the trial court's sentencing opinion. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 125, citing *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124.

{¶ 285} Finally, Johnson contends that the trial court improperly minimized the weight of the mitigating factors. However, "[i]n imposing sentence, the assessment of and weight given to mitigating evidence are matters within the trial court's discretion." *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 76. Our independent review cures any error here, as well. *State v. Ashworth* (1999), 85 Ohio St.3d 56, 67, 706 N.E.2d 1231, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 173, 555 N.E.2d 293.

{¶ 286} We overrule Johnson's 20th proposition.

### Cumulative Error

{¶ 287} In his 21st proposition, Johnson claims that the cumulative effect of the errors alleged in his brief denied him a fair trial. He fails to support this proposition, however, and we overrule it.

## Constitutionality of Death Penalty

{¶ 288} In his 23rd proposition, Johnson challenges the constitutionality of Ohio's death-penalty statutes. This proposition is not well taken. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus ("When issues of law in capital cases have been considered and decided by this court and are raised anew in a subsequent capital case, it is proper to summarily dispose of such issues in the subsequent case").

## Independent Sentence Review

{¶ 289} In his 22nd proposition of law, Johnson challenges the appropriateness of his death sentence. Our responsibility is to conduct an independent review, as mandated by R.C. 2929.05(A).

### A. Aggravating Circumstance

{¶ 290} Although the jury convicted Johnson on both specifications in the indictment, he was sentenced by the trial court only on Count 2 and its one aggravating circumstance: that he committed the murder while committing, attempting to commit, or fleeing immediately after committing or attempting to commit the felonies of kidnapping, rape, and aggravated robbery. The evidence supports the jury's finding.

### B. Mitigating Factors

{¶ 291} Johnson introduced evidence of a mitigating factor under R.C. 2929.04(B)(3) that "because of a mental disease or defect," he "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" when he killed Daniel. He also introduced evidence that he suffers from alcoholism and drug addiction and that he had consumed drugs and alcohol shortly before the murder.

{¶ 292} Marianna Williamson, a chemical-dependency counselor employed by Guernsey County, testified during the penalty phase that about a month before the murder, Johnson came to her office without an appointment, urgently seeking help for his drug- and alcohol-abuse problems. He reported increased tolerance and withdrawal symptoms, and according to Williamson, "he felt something terrible would happen if he didn't get help[.] * * * [H]e stated [he] may die or go crazy."

{¶ 293} Williamson diagnosed Johnson as dependent on alcohol, marijuana, and crack, and she scheduled Johnson for another appointment. He failed to keep it and could not be reached. Eventually, in August 2003, the county's chemical-dependency program dropped him for noncompliance.

{¶ 294} According to the records of Williamson's agency, Johnson sought help in 1992 and 1999 for chemical-dependency problems. She testified that Johnson

told her that previously he had been referred to an intensive outpatient program but that he never successfully completed counseling.

{¶ 295} Dr. Mark Fettman, a psychiatrist who is board certified in addiction psychiatry, testified that he interviewed Johnson, consulted with the defense psychologist, Dr. Jackson, and reviewed the following: Dr. Jackson's report; the report of defense mitigation specialist, Marcia Heiden; and records of the Guernsey County Alcohol and Drug Services agency. Dr. Fettman diagnosed Johnson as addicted to crack cocaine and dependent on marijuana and alcohol. Fettman also testified that addiction by itself does not make a person want to commit murder or other crimes.

{¶ 296} Johnson told Dr. Fettman that between 4:00 and 4:30 a.m. on the day of the murder, he consumed two 32–ounce containers of "E & J," which is "some kind of hard liquor [or] * * * distilled wine." Johnson also claimed that he consumed $40 worth of crack cocaine and unspecified amounts of powdered cocaine and marijuana. According to Fettman, a person with bipolar disorder "would probably be experiencing mood swings" if intoxicated with cocaine, marijuana, and alcohol. These would "[a]ffect his view of reality and also * * * his judgment."

{¶ 297} Dr. Richard E. Jackson, a clinical psychologist, interviewed Johnson in November 2003 and then again in January 2004, and he administered tests, including the Minnesota Multiphasic Personality Inventory ("MMPI–2").

{¶ 298} Dr. Jackson found that Johnson had a bipolar disorder with probable psychotic characteristics and paranoid personality disorder. When in the manic phase of his bipolar disorder, Jackson testified, Johnson suffers from delusions. He also suffers from "variable reality contact," which means that "for very extended lengths of time * * * [Johnson's] reality awareness can be perfectly adequate." However, when "stressors"—especially unexpected ones—exist, Johnson has an increased likelihood of "outbursts" that are often associated with "an alteration of reality contact." This occurs "only when stressors hit." "[V]ery shortly thereafter, [Johnson] can be right back to having normal perceptions and interacting in a perfectly appropriate way."

{¶ 299} In a written report admitted into evidence during the penalty phase, Dr. Jackson explained that he asked Johnson why he had tied Daniel up, and Johnson explained that he had been "nervous [and] scared," "seeing things and hearing things," but that "it could of [sic] been shadows, and maybe what [he] was hearing there was a dog in the house."

{¶ 300} When asked whether Johnson's mental disorders would deprive him of substantial capacity to conform to the law, Dr. Jackson testified: "I think that whenever an individual is displaying severe mental illness that it is very likely that during a manic state that he would lack the substantial capacity to conform

conduct to the requirements of the law." However, Dr. Jackson did not testify that Johnson suffered from a manic state at the time of the murder. And he conceded that many who suffer from the same type of problems as Johnson do not commit aggravated murder.

{¶ 301} At trial, Johnson argued that the evidence supported the R.C. 2929.04(B)(2) mitigating factor, that is, that he committed the offense while under "duress, coercion, or strong provocation." Although the trial court instructed on this mitigating factor, the record reveals no evidence of duress, coercion, or provocation.

{¶ 302} The defense also called Bonnie George, a friend of Johnson's for ten to 13 years, to testify on his behalf. Johnson sometimes stayed at her house, but their relationship did not become romantic. George described Johnson as "real polite" and a "good guy" who had "always helped [her] out." She testified that Johnson had held various jobs over the years and that when he stayed with her, he helped by cooking, cleaning, and watching her child.

{¶ 303} George testified that she never saw Johnson take drugs or act violently. Asked about her reaction when hearing of the murder, she stated: "[T]hat wasn't the Marvin I knew." However, she testified that, on the night of August 3–4, 2003, Johnson stole $775 from her and her granddaughter while he stayed at George's home. Johnson "had never done anything like that to [George]" before, and George never expected it. Despite this, George visited Johnson in jail, where they discussed the Bible and prayed together.

{¶ 304} George testified that Johnson sometimes spoke of his family in Alabama. He had a "really close" relationship with one of his sisters, George told the jury, and he had another sister to whom he had been close in his youth. George testified that Johnson did not have a close relationship with the rest of his family and had not visited them since George had known him.

{¶ 305} The evidence of mitigation does not outweigh that of aggravation. Voluntary intoxication generally deserves little weight as a mitigating factor. See, e.g., *State v. Dennis* (1997), 79 Ohio St.3d 421, 436, 683 N.E.2d 1096; *State v. Campbell* (2002), 95 Ohio St.3d 48, 51, 765 N.E.2d 334. In addition, while Johnson may have had mood swings due to intoxication on August 15, 2003, there is no evidence in the record that he suffered a manic phase at the time of the murder.

{¶ 306} Although stress may affect Johnson's ability to perceive reality, the record does not show that Johnson faced stressors at the time of the murder. Though we acknowledge Williamson's and Fettman's testimony regarding the severity of drug-withdrawal symptoms, no evidence shows that Johnson experienced withdrawal at the time of the murder. The lack of evidence regarding

stressors has significance because, as Dr. Jackson testified, "It's *only* when stressors hit [that] you're likely to see outbursts." (Emphasis added.)

{¶ 307} Further, the record does not suggest that Johnson killed Daniel during either an "outburst," a stress-caused "alteration of reality contact," or any other delusional moment. Rather, the record reveals that Johnson acted deliberately, with premeditation and advance planning. Moreover, the record demonstrates that Johnson wished to hurt Tina, as demonstrated by his statement during trial: "Do you recall times after sex with me * * * that you would, after finished, you would get up and go to the window? * * * You remember that feeling? That's what it felt like to beat your son in the f* * *ing head."

{¶ 308} Johnson's employment record, his history as an abused and neglected child, and his redeeming traits of spirituality, politeness, and helpfulness have little weight.

{¶ 309} We conclude that the felony-murder aggravating circumstance in this case outweighs the mitigating factors beyond a reasonable doubt.

## C. Proportionality

{¶ 310} The death sentence in this case is proportionate to sentences previously approved by this court in aggravated-murder cases with kidnapping, rape, or aggravated-robbery specifications. See, e.g., *State v. Twyford* (2002), 94 Ohio St.3d 340, 368, 763 N.E.2d 122 (kidnapping); *State v. Hartman* (2001), 93 Ohio St.3d 274, 306, 754 N.E.2d 1150 (kidnapping); *State v. Murphy* (2001), 91 Ohio St.3d 516, 547, 747 N.E.2d 765 (aggravated robbery); *State v. Mason* (1998), 82 Ohio St.3d 144, 170–171, 694 N.E.2d 932 (rape); *State v. McGuire* (1997), 80 Ohio St.3d 390, 404, 686 N.E.2d 1112 (rape); *State v. Fox* (1994), 69 Ohio St.3d 183, 195, 631 N.E.2d 124 (kidnapping); *State v. Clark* (1988), 38 Ohio St.3d 252, 264–265, 527 N.E.2d 844 (aggravated robbery).

{¶ 311} Accordingly, we affirm the convictions and death sentence in this case.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

---

Daniel G. Padden, Guernsey County Prosecuting Attorney, for appellee.

Buell & Sipe Co., L.P.A., and Dennis L. Sipe; McGarry Law Office and Kathleen McGarry, for appellant.