MARY J. BOYLE, P.J.:
*662 {¶ 1} Defendant-appellant, Ialie Robertson, appeals his gross sexual imposition and kidnapping convictions. He raises three assignments of error for our review:
1. Mr. Robertson was denied his right to effective assistance of counsel when [1] his lawyer failed to renew an objection to admission of Facebook message to AE from her stepfather when, despite a promise from the prosecutor, her father did not testify; and [2] his lawyer did not renew his Crim.R. 29 motion or move to vacate the verdicts and for a new trial when a "victim impact" letter from AE read to the court at sentencing indicated that she recognized that having sex with Robertson was a quid pro quo for his driving her to and from work.
2. Mr. Robertson was wrongly convicted of both gross sexual imposition and kidnapping. Because they are allied offenses of similar import pursuant to R.C. 2925.41, he could have been found guilty of both but should have only been sentenced for one.
3. Mr. Robertson's convictions were not supported by the manifest weight of the evidence.
{¶ 2} Finding merit to Robertson's second assignment of error, we affirm in part, reverse in part, and remand for resentencing.
I. Procedural History and Factual Background
{¶ 3} Robertson was indicted in March 2016 on three counts: attempted rape in violation of R.C. 2923.02 and 2907.02(A)(2), a second-degree felony; gross sexual imposition in violation of R.C. 2907.05(A)(1), a fourth-degree felony; and kidnapping in violation of R.C. 2905.01(A)(4), a first-degree felony, with a furthermore clause that the victim was over the age of 18. Robertson pleaded not guilty to the indictment. The following evidence was presented to a jury.
{¶ 4} The victim, A.E., testified that in February 2016, she and her three children were living with her mother, V.E., in V.E.'s one-bedroom apartment on the first floor of a six-story apartment building. V.E. rented her apartment from Cuyahoga County Metropolitan Housing Authority ("CMHA"). A.E. knew that she was not allowed to live in her mother's apartment, but she did not have anywhere else to go.
{¶ 5} While living with her mother, A.E. got to know many of the residents, including Robertson, whom she knew as "Buggy." Robertson lived on the fifth floor of the building. A.E. also knew Ida, who was older and lived on the third floor of the building, Samantha, who was also older and lived on the third floor, and Marshall Underwood, who lived down the hall from her mother. Ida and Samantha would watch A.E.'s children when A.E. had to work.
*663 {¶ 6} A.E. was working at a Walmart in South Euclid in February 2016. She did not have a car, so she would take the bus. She had to change buses several times to get to work, so it could take up to two hours for her to get to work. That winter, Robertson offered to drive A.E. to work and to pick her up when she was done. In exchange for driving her to and from work, A.E. paid Robertson $15 per day. A.E. said that although the bus only cost her a little over $5 to get to work, paying Robertson was worth it because it was winter and she hated waiting for the bus in the cold. Also, when Robertson drove her to work, it only took about 25 minutes to get there. She explained that she lost her previous job because of being late due to the bus commute.
{¶ 7} A.E. testified that Robertson was known for making sexual remarks and sexual jokes to everyone. In fact, A.E.'s mother complained to the apartment manager about Robertson's jokes sometime in 2015. A.E. said that when Robertson made sexual comments to her, she just "shrugged it off" because "that was him." A.E. said that she was not scared of Robertson. She never took him seriously and never thought that he would "act on it" because she had known him for so long.
{¶ 8} A.E. testified to several examples of Robertson's sexual comments. She said that when he drove her to work, he would "reach his hand over" and touch her hair and tell her that he loved it when she wore it down. He also made comments about her "fly" always being open and that her pants were too tight. A.E. said that she never responded to Robertson's comments and never initiated physical contact with him.
{¶ 9} On February 25, 2016, A.E. worked at Walmart until 8:00 p.m. She made arrangements for Samantha to watch her children. Robertson transported her to work and back as scheduled. As they were driving back to the apartment building, Robertson asked her if she could put drops in his eyes that night. Robertson needed the drops every night, but could not do it himself. A.E. and others in the apartment building helped him with the drops. Before that day, A.E. had only put drops in Robertson's eyes "probably five or six" times. The first couple of times, she put the drops in Robertson's eyes in the lobby of the apartment building. The last two to three times, she went to his apartment to do it. A.E. had never been to Robertson's apartment for any reason other than to put drops in his eyes, and she had only been there "about three times total."
{¶ 10} When the two of them got back to the apartment building, A.E. dropped her things off at her mom's apartment and then stopped by Samantha's to see her children. She was at Samantha's for about 20 minutes and then told Samantha that she would be right back to get "her kids" after she put drops in Robertson's eyes. Normally, A.E. put the drops in his eyes and left, and it would only take two or three minutes.
{¶ 11} A.E. went to the fifth floor to Robertson's apartment, which had a small living room and kitchen and one small bedroom. A.E. was shorter than Robertson, so he had to sit down for her to put the drops in his eyes. Because Robertson did not have any furniture in his living room or kitchen, A.E. put the drops in Robertson's eyes while he sat on his bed.
{¶ 12} When A.E. walked in Robertson's bedroom, he had a "joint" in an ashtray beside the bed. He asked her if she "wanted to hit" it. She told him "no." A.E. "grabbed" the drops from Robertson's dresser, which were beside the bed, and put them in Robertson's eyes. She briefly turned back toward the dresser to place the drops on it, and when she did, Robertson *664 grabbed her by her knees and "flung" her on the bed. A.E. said that she ended up on her back on Robertson's bed, and he climbed on top of her. A.E. testified that Robertson held her down on the bed with his body, with one of his knees between her legs. A.E. stated that Robertson began to try to loosen her belt buckle. A.E. was still wearing her work clothes, which were "cotton work pants" and a navy shirt. Robertson told A.E. that her "pants weren't super tight," which she believed meant that he was saying to her that she came to his apartment "[t]o sleep with him."
{¶ 13} A.E. said that Robertson tried to get her buckle loose three times. When he could not get it loose, he tried to pull her pants down. As he did, his thumb was inside the waistband of her pants, and she could feel his thumb against her bare skin. Robertson pulled her pants halfway down her buttocks with his hand inside of her underwear as he did it.
{¶ 14} A.E. testified that the whole incident lasted "a few minutes." She said that she fought Robertson the entire time and kept telling him "no, that's not what I came up here for," and to get off of her. She said that she kept trying to "scoot on the bed so that [her] pants would come back up." She also tried to sit up, but he pulled her back down. She was scared, but did not scream because she "honestly thought he would stop." A.E. said that she was just in "shock," because she thought that Robertson was her friend. Robertson never pulled her pants down all the way.
{¶ 15} After a few minutes, A.E.'s cell phone rang. She said that her phone had fallen on the bed, but she could reach it. She saw that it was Samantha and told Robertson that she had to "get her kids." He let her go. As she was leaving, he walked her to the door and asked her if "he messed up." She left without answering his question.
{¶ 16} When she left Robertson's apartment, she went to Samantha's to get her children. She did not tell Samantha what happened. She said that Samantha was really good friends with Robertson, so she did not want to tell her. Also, A.E. explained that she did not want anyone to know because nothing like that had ever happened to her. She was also worried that if everyone found out, she would have to move out of her mother's apartment and she did not have anywhere to go.
{¶ 17} Soon after she got back to her mother's apartment, however, she wrote the following statement on Facebook at 10:20 p.m.: "I understand why they don't say anything even it's not your fault you still feel hopeless and to blame, I never gave the impression after 5 yrs I never gave that impression [four sad emojis] God help me."
{¶ 18} Five minutes later, A.E. sent a private message to her stepfather (whom she referred to as her "father") on Facebook. She told her father that "somebody just tried to force [himself] on me after I said no like fifty times, he tried to pull my pants down and kept throwing me down." She further told her father that the man "kept asking me was I gone [sic] call the police on him and did he mess up with me." She said that if Samantha had not called, she does not know what would have happened. She begged her father not to tell anyone, stating that she did not "want any trouble." She told her father that she "never tried to lead [the man] on" and "never said I wanted him in any way. He always flirted but I never took it serious please I just wanna forget it ever happened." When her father told her that she needed to "get out of there," she responded that she did not have anywhere to go. A.E. further told her father:
Im scared and he's gonna deny it hes gonna say I tried to come on to him but *665 that never happened I just went to put some drops in his eyes like I always do but this time he grabbed me and threw me down he kept asking me did he mess up cause I kept saying no and he was trying to take it I'm not like that I never been like that I never told him I wanted him he was supposed to be my friend I just don't want any trouble[.]
[Sic.]
{¶ 19} Her father then asked, "I take it he lives there?" She replied "yes," and said that the man had been driving her to and from work. She then stated, "I kept saying no I don't know if he thought I was playing or what but I kept saying no kept trying to move his hands."
{¶ 20} In another Facebook post, A.E. expressed that she was not lying about what happened. She wrote, "what do I have to gain from this?" She testified that she had nothing to gain from lying, but everything to lose for telling the truth because she would lose "a place to stay."
{¶ 21} Right after A.E. told her father, she then "messaged" Marshall Underwood, who lived up the hall from her mother, on Facebook and told him that Robertson had tried to force himself on her. A.E. then walked to Ida's apartment and told her. When she told Ida, she said that she broke down and cried hysterically.
{¶ 22} After she told Ida, she went back to her mother's apartment. Her mother was awake, but in bed. A.E. was supposed to braid her mother's hair that night, but she asked her mother if she could do it in the morning. As she was leaving her mother's room, she "broke down" and told her what happened. Her mother called the police. Two days later, A.E. had to move out of her mother's apartment because of the incident. She moved into a hotel with her children. She never saw Robertson after the incident.
{¶ 23} On cross-examination, A.E. admitted that she had smoked marijuana with Robertson in the past, but never in his apartment. She agreed that after this incident, she was no longer friends with Samantha. When asked if she and Robertson had talked about having sex "numerous times," she replied that she never initiated any conversation with Robertson about sex but that Robertson "always" initiated it. She also denied ever talking about going to a hotel with Robertson to have sex. When asked if she and Robertson had talked about "having sex in his apartment that day," she replied that she did not recall. The following exchange between Robertson's defense counsel and A.E. then took place:
Q. You don't recall? * * *
A. Of us having sex, no, I do not.
Q. You did not?
A. No.
Q. Had you talked about it with him on the phone that day?
A. I don't recall. If we did, I probably told him to shut him up.
Q. What did you tell him?
A. I don't recall.
Q. What did you tell him?
A. Probably just that, yeah, maybe. I don't recall. I really don't remember.
{¶ 24} A.E. then stated she only went to Robertson's apartment to put drops in his eyes and that she did not "recall us having a conversation about us having sex."
{¶ 25} A.E.'s mother testified that she had lived in her apartment for about six years. She told the jury about the time in 2015 when she complained to management about Robertson making sexual comments to her. She did not think that he would do the same thing to A.E. because she thought that Robertson looked at A.E. "more like a daughter."
*666 {¶ 26} Underwood, who lived up the hall from A.E.'s mother, also testified that A.E. sent him a private message through Facebook telling him what Robertson had just done to her. Underwood told A.E. that he was sorry that happened to her. Underwood said that he did not talk to police because he did not want to get involved.
{¶ 27} CMHA police officer, Manuel Leon, and his partner were the first to arrive at the scene. Officer Leon said that A.E. was "highly agitated." She was crying and "shaking a lot," and her voice was very weak. A.E. told the officers that she went to Robertson's apartment to put drops in his eyes and that Robertson pulled her onto his bed by her thighs, pinned her to the bed, and tried to remove her jeans. Because it was a sexual assault allegation, Cleveland police, who had concurrent jurisdiction, took over the case.
{¶ 28} Cleveland police officer, Barry Bentley, testified that he was the first Cleveland officer at the scene. He said the victim was "distraught," "tearing up," crying, and "shaky." Officer Bentley identified a recording from another officer's body camera that depicted what happened when he and other officers first went to Robertson's apartment. The body cam video was played in court. Robertson told police that he sat on the bed and playfully "grabbed" A.E. to sit on the bed with him. Officer Bentley explained that Robertson kept altering his story and that he could never get a straight answer out of Robertson. He arrested Robertson and took him to the police station.
{¶ 29} Detective Morris Bruce Vowell of the Cleveland Police Department testified that he received the case on February 26, 2016. He interviewed A.E., who told him the same story that she told the CMHA officer and that she wrote in her statement to police. He interviewed A.E.'s mother too, who reported that A.E. told her the same version of events as well. Detective Vowell also spoke to A.E.'s father, who gave him permission to get into his Facebook account and print copies of his private conversation with A.E.
{¶ 30} Detective Vowell interviewed Robertson on February 26, 2016. The interview was video-recorded, and played in court. In his recorded statement, Robertson told Detective Vowell that when he drove A.E. to work on the day of the incident, he asked her if they were going to have sex that night. He also asked her if she was on her period. A.E. said to him, "you think we're going to have sex tonight?" He replied, "I'm just asking."
{¶ 31} Robertson said that when A.E. came to his apartment on the night of February 25, she rubbed up against him when she walked in the door. He said to her, "you better cut that shit out." Robertson told Detective Vowell that after A.E. put the drops in his eyes, he pulled A.E. onto the bed by her legs, but that he did not climb on top of her or attempt to pull her pants down. Robertson said that he grabbed the left waistband of A.E.'s pants and said, "come on," but he stopped when she said no because "no means no." Robertson said that was the only time he touched A.E.
{¶ 32} Robertson told Detective Vowell that two weeks prior, he and A.E. were going to have sex. Robertson said that A.E. wanted to have sex. He explained that A.E. came to his room and they smoked marijuana and that they were going to have sex, but did not. When the detective asked him why, Robertson responded that he was high and could not do it.
{¶ 33} Robertson also told Detective Vowell that when A.E. was working in Solon, he drove her kids to school and then took her to work. She did not have the money *667 to pay him, so he suggested that they go to a hotel to have sex. Robertson called it a "fair exchange" for everything he did for her.
{¶ 34} At the close of the state's case, Robertson moved for a Crim.R. 29 acquittal, which the trial court denied. Robertson then rested and renewed his Crim.R. 29 motion, which the trial court again denied.
{¶ 35} The jury found Robertson not guilty of attempted rape, but guilty of gross sexual imposition and kidnapping. At the beginning of the sentencing hearing, Robertson argued that the gross sexual imposition and kidnapping offenses should merge, but the trial court disagreed. The trial court sentenced Robertson to concurrent terms of five years in prison for kidnapping and 17 months for gross sexual imposition. The trial court further imposed a fine of $250 on each offense plus costs. The trial court also notified Robertson that he would be classified a Tier I sex offender and be subject to five years of postrelease control upon his release from prison.
II. Ineffective Assistance of Counsel
{¶ 36} In his first assignment of error, Robertson argues that his trial counsel was ineffective for two reasons: (1) when his trial counsel failed to renew an objection to the admission of Facebook messages to A.E. from her father, and (2) when his trial counsel did not move to vacate the verdict and for a new trial when A.E.'s "victim impact" letter was read to the court at sentencing.
{¶ 37} To succeed on an ineffective assistance claim, Robertson must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient performance, Robertson must prove that his trial counsel's performance fell below an objective standard of reasonable representation. Id. at 688, 104 S.Ct. 2052 ; State v. Bradley , 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action 'might be considered sound trial strategy.' " Id. at 689, 104 S.Ct. 2052, quoting Michel v. Louisiana , 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1955).
{¶ 38} To show prejudice, Robertson must establish that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. State v. Hale , 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing Strickland and Bradley . The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. Strickland at 697, 104 S.Ct. 2052.
A. Failure to Renew Objection
{¶ 39} Robertson claims here that his trial counsel was deficient when he failed to renew his objection to the state's admission of the Facebook messages from A.E.'s father to A.E. When the state introduced the Facebook messages during A.E.'s testimony, Robertson's trial counsel objected to the father's responses to A.E.'s messsages to him. The state informed the court that A.E.'s father was scheduled to testify the following day, but he never did.
{¶ 40} In State v. Johnson , 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, the Ohio Supreme Court explained the following with respect to counsel's failure to object:
"[E]xperienced trial counsel learn that objections to each potentially objectionable *668 event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."
Id. at ¶ 140, quoting Lundgren v. Mitchell , 440 F.3d 754 (6th Cir.2006).
{¶ 41} Even assuming for the sake of argument that Robertson's counsel should have renewed his objection when A.E.'s father did not testify, we find no prejudice to Robertson. Notably, it is A.E.'s Facebook messages to her father-telling what Robertson did to her-that implicate Robertson. Robertson does not object to those messages being admitted. He only contends that A.E.'s father's responses were hearsay and should have been redacted. But A.E.'s father's Facebook responses do not implicate Robertson in any way. Her father simply told her that he could not keep quiet about the incident, that she should no longer stay there, and that she should not ride in Robertson's car anymore. We cannot see how Robertson suffered any prejudice by the jury seeing A.E.'s father's responses.
B. Victim Impact Letter
{¶ 42} Robertson also argues that his counsel was ineffective when he did not move for a new trial when A.E.'s "victim impact" letter was read to the court at sentencing. At Robertson's sentencing hearing, A.E. did not appear. An advocate from the Rape Crisis Center read A.E.'s letter to the court. The victim stated:
I only have a few things to say. What happened that night has changed my life in so many ways. I lost a lot of friends and became more and more antisocial. You were a friend of mine, and I never thought things would go so wrong. I don't think you know the stress it caused me. What you did resulted in me losing a roof over my head, having to sleep in a bedbug-infested motel with my children. You knew everything I was going through. You wanted to help. Did that mean I had to sleep with you? Forgive me for ever making it seem as if that was acceptable. I hope and pray that you can forgive yourself for what you've done. Thank you.
{¶ 43} Robertson claims that his counsel should have moved for a new trial when the advocate read the following from A.E.'s letter: "You knew everything I was going through. You wanted to help. Did that mean I had to sleep with you? Forgive me for ever making it seem as if that was acceptable." Robertson claims that this statement "suggest[s] that there was a quid pro quo arrangement * * * for sex in exchange for rides." He asserts that this statement "adds significant force to the already substantial evidence indicating that [he] should not have been found guilty."
{¶ 44} First, we disagree with Robertson that A.E.'s statement suggests that any quid pro quo arrangement existed. If anything, the statement proves the opposite-that no such arrangement existed. Her statement indicates that she thought Robertson may have believed that she owed him sex in exchange for driving her, but not that she ever agreed to such an arrangement. Indeed, Robertson's video-recorded statement establishes that he believed that he was entitled to sex in exchange for driving her. In the statement, *669 he referred to it as "a fair exchange" for what he did for A.E.
{¶ 45} Second, even if we assumed for the sake of argument that A.E.'s statement suggests there was a quid pro quo arrangement between the two-which we do not-that still would not justify Robertson's actions of forcing A.E. onto his bed against her will, holding her down with the weight of his body, trying to remove her belt, and putting his hand inside of her pants and underwear. Nothing justifies forcefully holding a victim down against her will and touching her sexually without her permission.
{¶ 46} Finally, even assuming for the sake of argument that Robertson's counsel should have moved for a new trial, we find that the outcome of his trial would have been the same even if A.E.'s letter had been not admitted. Indeed, A.E.'s version of the events-her testimony at trial, her comments on Facebook, and her statements to the other officers, her mother, and to her neighbor-was consistent. Robertson's version of events was not. As Officer Bentley testified, when police first questioned Robertson, he kept changing his story and could not give a "straight answer."
{¶ 47} Accordingly, we overrule Robertson's first assignment of error.
III. Allied Offenses of Similar Import
{¶ 48} In his second assignment of error, Robertson argues that the trial court erred when it did not merge his convictions for kidnapping and gross sexual imposition. We agree.
{¶ 49} The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution, and the Ohio Constitution, Article I, Section 10, protect a defendant against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. North Carolina v. Pearce , 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) ; State v. Martello , 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 7. But the Double Jeopardy Clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter , 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). Thus, the dispositive issue is "whether the General Assembly intended to permit multiple punishments for the offenses at issue." State v. Childs , 88 Ohio St.3d 558, 561, 728 N.E.2d 379 (2000).
{¶ 50} In Ohio, this constitutional protection is codified in R.C. 2941.25. " R.C. 2941.25 essentially codified the judicial merger doctrine." State v. Cabrales , 118 Ohio St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, ¶ 23. "Merger is 'the penal philosophy that a major crime often includes as inherent therein the component elements of other crimes and that these component elements, in legal effect, are merged in the major crime.' " Id. at ¶ 23, fn. 3, quoting Maumee v. Geiger , 45 Ohio St.2d 238, 344 N.E.2d 133 (1976).
{¶ 51} Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However,
[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the *670 defendant may be convicted of all of them.
R.C. 2941.25(B).
{¶ 52} Two or more offenses are of dissimilar import within the meaning of R.C. 2941.25(B)"when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." State v. Ruff , 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph two of the syllabus.
{¶ 53} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." Id. at ¶ 26. In Ruff , the Supreme Court held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true (1) the conduct constitutes offenses of dissimilar import or significance, (2) the conduct shows the offenses were committed separately, or (3) the conduct shows the offenses were committed with separate animus or motivation. Id. at paragraph three of the syllabus, citing R.C. 2941.25(B).
{¶ 54} When determining whether two offenses are allied offenses of similar import, we apply a de novo standard of review. State v. Williams , 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.
{¶ 55} R.C. 2905.01(A)(4) sets forth the elements of kidnapping as: "[n]o person, by force, threat, or deception, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will."
{¶ 56} Gross sexual imposition under R.C. 2907.05(A)(1) provides that "[n]o person shall have sexual contact with another * * * when * * * [t]he offender purposely compels the other person, or one of the other persons, to submit by force or threat of force."
{¶ 57} There is no question that when looking at Robertson's conduct in this case, it supports the offenses of kidnapping and gross sexual imposition. Thus, we must use the three-part test set forth in Ruff to determine if the offenses are dissimilar in import, were committed separately, or were committed with a separate animus.
{¶ 58} The first two questions can be easily answered. In this case, there was only one victim, the offenses were not committed separately, and the resulting harm from each offense was the same. Robertson restricted A.E.'s movement to commit the act of gross sexual imposition. Robertson pulled A.E. onto the bed, climbed on top of her, and unsuccessfully tried to loosen her belt and pull her pants down. According to A.E., the entire incident lasted "a few minutes." Thus, the offenses are similar in import and were not committed separately.
{¶ 59} To answer the third question, were the offenses of rape and kidnapping committed with separate animus or motivation, we turn to a case that is nearly 40 years old: State v. Logan , 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979). In Logan , the Supreme Court held the following:
In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is *671 substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.
Id. at the syllabus.
{¶ 60} Here, the restraint of the victim was merely incidental to the gross sexual imposition. Although the confinement was "secretive"-in Robertson's bedroom-the restraint was not prolonged and the movement was not substantial. And as we previously stated, A.E. was not subjected to a substantial risk of harm separate and apart from the gross sexual imposition.
{¶ 61} The state maintains that A.E. was subjected to "separate and identifiable harm" because the victim suffered one harm when Robertson forced her down on the bed, causing her to be "shocked and scared," and a separate harm when Robertson "forced her pants down and put his hands underneath her underpants." We find the state's argument to be wholly unfounded, lacking any sound reasoning, and against the nearly 40-year-old precedent set forth in Logan .
{¶ 62} We further find the state's citation to State v. Asadi-Ousley , 2017-Ohio-7252, 102 N.E.3d 52, in support of its argument that A.E. suffered separate harm to be disingenuous. In Asadi-Ousley , the victim was walking on the street at night when the defendant grabbed her from behind, held a knife to her neck, told her not to scream or he would kill her, covered her mouth with his hand, forced her from the street to an alleyway at knife point, struck her in the back of the head causing her to lose unconsciousness, and raped her while she was unconscious. This court held that although the "restraint of [the victim] was not prolonged, nor was the movement substantial," there was a separate animus as to felonious assault, kidnapping, and rape due to the substantial increased harm the victim suffered from each offense. Id. at ¶ 52.
{¶ 63} With respect to whether felonious assault was an allied offense to kidnapping and rape, we explained at ¶ 44 :
Significantly, Asadi-Ousley's argument disregards the fact that he struck T.M. on the top of her head with an unidentified object just prior to the commission of the rape. In our view, this conduct unquestionably involved a separate and identifiable harm, apart from T.M.'s kidnapping and the subsequent rape. While the record reflects that the felonious assault offense was committed during the commission of the kidnapping offense, the physical injuries caused by the felonious assault were separate and distinct from the harm caused by Asadi-Ousley's movement of T.M. at knife point. Similarly, while the felonious assault may have been committed to facilitate the rape, it involved a separate harm from the harm that was involved in the commission of the rape. Accordingly, we find Asadi-Ousley's felonious assault was an offense of dissimilar import and, therefore, was not an allied offense subject to merger.
{¶ 64} With respect to the rape and kidnapping offenses, we further reasoned:
In this case, T.M. was knocked unconscious during her movement into the alleyway. Although the asportation was limited, Asadi-Ousley's commission of the "dissimilar" felonious assault offense during his movement of T.M. rendered her defenseless and, in our view, subjected *672 her to an increased risk of harm that was separate and apart from that involved in the underlying rape. Under these circumstances, the kidnapping offense ceased to be incidental to the underlying rape from which it might have originated. See State v. Jones , 10th Dist. Franklin No. 15AP-670, 2017-Ohio-1168 [87 N.E.3d 900] (holding that defendant's blows to victim's head which knocked her to the floor and rendered her unconscious constituted substantial increases in the risk of harm separate and apart from the force involved in raping a victim); State v. Terrell , 1st Dist. Hamilton No. C-080286, 2009-Ohio-3257 [2009 WL 1900427] (holding that victim was subjected to a substantial increase in risk of harm separate and apart from rape when victim was struck in the face and moved to a nearby grassy area where a rape occurred). Accordingly, we find there was "a separate animus as to each offense sufficient to support separate convictions" for kidnapping and rape.
Id. at ¶ 52.
{¶ 65} To say that the gross sexual imposition and kidnapping offenses in the present case are analogous to the kidnapping and rape in Asadi-Ousley is wholly without merit and bordering on absurd.
{¶ 66} Robertson's second assignment of error is sustained.
IV. Manifest Weight of the Evidence
{¶ 67} In his third assignment of error, Robertson argues that his convictions were against the manifest weight of the evidence.
{¶ 68} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. Id. , citing State v. Robinson , 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).
{¶ 69} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." Id. In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine " 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " Id. at 387, 678 N.E.2d 541, quoting State v. Martin , 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." Id.
{¶ 70} The crux of Robertson's argument is that the evidence established that A.E. was a willing participant. Robertson claims that the evidence shows that (1) his acts were not hostile, (2) he did not grab A.E. against her will, and (3) he did not hold her down.
{¶ 71} A.E. testified that Robertson pulled her down on his bed against her will, pinned her down with his body, tried to loosen her belt, and when he could not do so, attempted to pull her pants down-all while she was trying to get away from him and telling him "no." Robertson admitted to police that he grabbed A.E. and pulled her onto his bed. Robert even admitted that he grabbed the waistband of A.E.'s pants. But where A.E.'s and Robertson's *673 version of events differ is that A.E. claims that it was against her will and Robertson maintains that A.E. wanted to have sex with him.
{¶ 72} Robertson maintains that he told police that he and A.E. had talked about sex many times, which he claims is evidence that the act was consensual. A.E., however, testified that it was Robertson who talked about sex all of the time and was the one who made inappropriate sexual comments to her. She stated that she never initiated sexual conversation with Robertson. Even if A.E. did go along with Robertson's "sex talk" and participate in the conversations, that would not give Robertson permission to commit sexual assault against her.
{¶ 73} Robertson attempts to discredit A.E.'s testimony by pointing to his statements to police that A.E. had once agreed to go to a hotel with him to have sex when she could not afford to pay him for driving her to work. A.E., however, denied that she had agreed to go to a hotel with Robertson.
{¶ 74} Robertson further argues that the evidence shows that A.E. talked about having sex with him on the day of the incident. He points to A.E.'s response during cross-examination when defense counsel asked her if she and Robertson had talked about sex on the phone on the day of the incident. A.E. replied that she did not recall. Upon further questioning, A.E. said, "[i]f we did, I probably told him to shut him up." When questioned even further as to what she told Robertson on the phone, A.E. stated, "[p]robably just that, yeah, maybe. I don't recall. I really don't remember." A.E. then testified that she only went to Robertson's apartment to put drops in his eyes and that she did not "recall us having a conversation about us having sex."
{¶ 75} Robertson contends that the fact that A.E. stated that she may have told Robertson "yeah, maybe," reflects poorly on A.E.'s credibility. Determinations regarding the credibility of witnesses and the weight of the testimony, however, are primarily for the trier of fact. State v. Bradley , 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, 2012 WL 2355778, ¶ 14, citing State v. DeHass , 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." State v. Wilson , 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." State v. Raver , 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, citing State v. Antill, 176 Ohio St. 61, 197 N.E.2d 548 (1964). In this case, the jury believed A.E. that she did not consent to being touched sexually by Robertson.
{¶ 76} Finally, Robertson argues that A.E.'s credibility is suspect because she did not immediately tell Samantha what had "supposedly" just happened, nor did she immediately tell her mother what had happened and that when she did, she wanted her mother to "keep it a secret." But A.E. explained why she did not tell Samantha or immediately tell her mother, and why she did not want anyone to know initially. The jury chose to believe her testimony, as it is permitted to do.
{¶ 77} At the trial, the jury also heard evidence from several witnesses who testified that A.E. was distraught, shaking, and crying when telling others what happened in Robertson's apartment. A.E.'s mother testified to A.E.'s demeanor, as well as three police officers. A.E. further told her *674 father and Underwood in private Facebook messages what Robertson had just done to her. Thus, the jury heard more than just A.E.'s testimony.
{¶ 78} It appears from A.E.'s testimony that she really wanted Robertson to drive her to work and that for him to do so, she had to put up with his sexual innuendos. It also appears that Robinson's actions in his bedroom that day shocked her. She said that she never thought that Robertson would actually attempt to physically act on his comments because she had known him for so long.
{¶ 79} Thus, after reviewing the entire record, we find that this is not the "exceptional case in which the evidence weighs heavily against the conviction." Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541.
{¶ 80} Robertson's third assignment of error is overruled.
{¶ 81} Judgment affirmed in part, reversed in part, and cause remanded for resentencing. On remand, the state must elect the allied offense on which to proceed for purposes of sentencing.
SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR